**CROSSETT LUMBER CO. v. UNITED STATES.**

Civ. A. No. 453.

District Court, W. D. Arkansas, El Dorado Division.

July 31, 1948.

Preston B. Kavanagh and Pope, Ballard & Loos, all of Washington, D. C., Lamar Williamson and Williamson & Williamson, all of Monticello, Ark., for plaintiff.

Lyle M. Turner, Sp. Asst. to Atty. Gen., R. S. Wilson, U. S. Atty., and Charles A. Beasley, Jr., Asst. U. S. Atty., both of Fort Smith, Ark. (Theron Lamar Caudle, Asst. Atty. Gen., and Andrew D. Sharpe, Sp. Asst. to Atty. Gen., on the brief), for defendant.

JOHN E. MILLER, District Judge.

Formal findings of fact and conclusions of law have been filed with the clerk of the court, in which the facts are set out in detail, and upon which, judgment for the plaintiff has been entered. Learned counsel for the respective parties have earnestly and ably tried the case and have filed thorough and exhaustive briefs in support of their contentions. There is no material dispute as to the facts, but there is a sharp disagreement as to the law to be applied, and for this reason the court feels that it should briefly state the reasons that impelled it to render judgment for the plaintiff. Only such facts as are necessary to a clear understanding of the issue will be referred to herein.

The plaintiff seeks to recover certain internal revenue taxes assessed and collected by the Collector of Internal Revenue under Titles VIII and IX of the Social Security Act, 49 Stat. 620, 42 U.S.C.A. § 301 et seq., and the Federal Insurance Contributions Act, 26 U.S.C.A.Int.Rev. Code, § 1400, and the Federal Unemployment Tax Act, 26 U.S.C.A.Int.Rev.Code, § 1600. The plaintiff is an Arkansas corporation owning and operating saw mills, a planing mill, a pulp and paper mill and a hardwood distillation plant (an affiliated corporation, Crossett Chemical Company, operates the latter) at Crossett, Arkansas. Raw materials to supply these mills are in the main obtained from company owned land, the plaintiff owning some 500,000 acres of timber land in Arkansas and Louisiana.

Prior to 1934 the plaintiff handled its logging operations by employees, utilizing the "Logging Camp" or "Clear Cut"

system. However, subsequent to that date the plaintiff inaugurated a "Sustained Yield" system on a scientific cutting basis with an end in view of conserving and, if possible, making perpetual the necessary supply of timber. Under the new system the cutting and hauling of the timber is done by contractors.

The period of time involved in this litigation is from January 1, 1936, to June 30, 1941. During the first part of this period (1936 to 1938) oral contracts were entered into by the plaintiff and the contractors, but beginning in November, 1938, the contracts were reduced to writing. Under the terms of the contract the contractor was to follow sound practices of timber conservation and reproduction; the owner (plaintiff) to pay in accordance with the current published rate schedule; and an option was given to either party to cancel the contract upon three days' notice. An amendment to the contract in 1940 specified that the contractor would exercise an independent employment and must, upon request, present his books and records for inspection by the plaintiff.

During the period plaintiff had contracts with approximately 40 to 50 contractors at any given time, and the contractors in turn employed approximately 500 to 600 men. The number of men employed by a particular contractor varied with the size of his operations. In general the contractors employed from 5 to 8 men per truck, and the minimum investment, that of a one truck operator, was $2,000.00 to $3,000.00 in tools and equipment.

The contractors employed and discharged their own men, paid their wages, fixed and worked their own hours, and furnished and maintained their own equipment. Plaintiff did not consider the contractors and their men as employees, did not subject them to the company' employment standards, and did not extend to them the benefits extended to admitted employees.

Under the Sustained Yield system plaintiff divided its land into 5 units of approximately 100,000 acres each and placed a District Supervisor in charge of each unit. It was the duty of the District Supervisor to plan the cutting operations in his district so as to carry out the program of the company and at the same time, see that his district furnished its quota of raw materials. He likewise gave attention to fire prevention and the cultivation of good public relations with 1300 to 1500 individuals who owned land within the boundaries of the area.

The timber land available for cutting over was divided into tracts of 40 acres each, each tract being marked and the trees to be cut spotted with paint. While the contractor was cutting the timber the supervisor made periodic inspection visits to ascertain if the contractor and his men were following sound forestry practices. If, in the opinion of the supervisor, the tract was not being cut properly, the contractor was so advised, the supervisor pointing out wherein the contractor was not cutting the tract in accordance with the plan and the terms of the contract. On such occasions the supervisor dealt with the contractor or his foreman and did not instruct the contractor's men as to how their work should be performed. After completion of a particular 40 acre tract a contractor would move on to another in the same district, which had been spotted and made ready for cutting.

At times the contractors were requested to curtail or speed up their work, according to the supplies of timber on hand at the mills. In certain instances of wet weather contractors were shifted from one tract to another, and during the summer months cutting operations were often stopped entirely, because weather conditions and insects made it impossible to store the timber for future milling. But for this fact, the contractors could have increased their earnings considerably, because the summer weather was conducive to good roads and good cutting conditions.

The contractors were furnished specifications for logs, pulp wood and chemical wood, which served as the basis for plaintiff's acceptance of the logs and wood.

Contractors were compensated on a unit of production basis, so much per 1000 board feet, log scale, and so much per cord for pulp and chemical wood. The rates were compiled by the plaintiff and were put into

effect in the form of a published rate schedule. After considering costs, labor, maintenance, depreciation, etc., a profit margin for the contractor was added, the sum total of which was the rate published. Often changes were made in the rates, as when a contractor took the position that due to existing conditions of the road, cutting tract, and weather, he could not make a profit under the prevailing rate. In general the rates were increased during the period involved.

Section 1101(a)(6) of the Social Security Act, 42 U.S.C.A. § 1301(a)(6), originally provided that "the term 'employee' includes an officer of a corporation", but did not contain a definition of the basic term "employee".

Subsequent to the enactment of the Social Security Act in 1935 and until 1947, the Treasury Department through its regulations (promulgated after the effective date in 1939 of the Federal Insurance Contributions Act and the Federal Unemployment Tax Act and substantially the same as the regulations in existence prior to that date), and a majority of the courts through the various cases, interpreted the action of the Congress in refraining from inserting a definition to mean that the generally accepted common law control test should govern in determining whether a particular individual was an employee within the meaning of the Social Security Legislation.

However, the application of the common law test was not uniform, and the question reached the United States Supreme Court in United States v. Silk, 331 U.S. 704, at page 705, 67 S.Ct. 1463, 1464, 91 L.Ed. 1757, in which the court stated:

"Writs of certiorari were granted, * * * 329 U.S. 702, 67 S.Ct. 111 [91 L.Ed. 612] and Harrison v. Greyvan Lines, 329 U.S. 709, 67 S.Ct. 369, [91 L.Ed. 616], because of the general importance in the collection of social security taxes of deciding what are the applicable standards for the determination of employees under the Act. Varying standards have been applied in the federal courts."

In the Silk case the Supreme Court pointed out that "as the federal social security legislation is an attack on recognized evils (insecurities of old age and unemployment) in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose", and that "such an interpretation would only make for a continuance, to a considerable degree, of the difficulties for which the remedy was devised and would invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation". The court then followed the reasoning it had advanced in National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (which decisions foreshadowed the interpretation in the Silk case, supra) to the effect that the word "employee" was not a word of art, and that it was to be construed "in the light of the mischief to be corrected and the end to be attained", and that in the light of the purposes of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., "employees" included workers who were such as a matter of economic reality. Then the court in the Silk case used the following language, heralded by the Treasury Department as supporting, and indeed, necessitating the proposed new regulations under the Revenue Acts, supra:

"Probably it is quite impossible to extract from the statute a rule of thumb to define the limits of the employer-employee relationship. The Social Security Agency and the courts will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete."

See, also: Bartels et al. v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947, 172 A.L.R. 317, for a reassertion of the so-called "economic reality" test for determining who are employees.

As a result of the language used in the Silk and Bartels cases the Treasury Department decided to revamp its regulations, and published its new proposals in Federal Register, Volume 12, Number 232, page 7966. The following excerpt taken from Proposed Regulations #402.204 contains

the proposed new test, and follows very closely the language quoted above:

"b Factors to be considered. * * * Whether the Services performed by an individual constitute him an employee as a matter of economic reality or an independent contractor as a matter of economic reality is determined in the light of a number of factors, including the following (although their listing is neither complete nor in order of importance):

"(1) Degree of control over the individual.

"(2) Permanency of relation.

"(3) Integration of the individual's work in the business to which he renders service.

"(4) Skill required of the individual.

"(5) Investment by the individual in facilities for work.

"(6) Opportunities of the individual for profit or loss."

These proposed regulations gave rise to considerable criticism from members of the Congress, which criticism culminated in the passage of H.J.Res. 296, June 14, 1948, 62 Stat. 438, intended "to maintain the status quo in respect of certain employment taxes and social-security benefits pending action by Congress on extended social-security coverage".

█ H.J.Res. 296 made the following changes in the acts of Congress. Section 1426(d) and section 1607 (i) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, §§ 1426(d), 1607(i), were amended to read as follows:

"The term 'employee' includes an officer of a corporation, *but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules."* (Italics added.)

Section 1101 (a) (6) of the Social Security Act, 42 U.S.C.A. § 1301(a) (6), was amended to read as follows:

"The term 'employee' includes an officer of a corporation, *but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules."* (Italics added.)

By the passage of H.J.Res. 296 the Congress exercised its prerogative to define, at least negatively, who shall be covered by its Social Security Legislation, and undoubtedly properly so, because the power to extend or limit the coverage of the Legislation lies exclusively with the Congress.

The immediate effect of H.J.Res. 296 is to prevent the adoption by the Treasury Department of the proposed new regulations and to compel the retention of the existing regulations. The latter have the approval of the Congress, as is evidenced by the following statements from Senate Report No. 1255, Committee on Finance, 80th Congress, 2d Session. In paragraph one the report states:

"The joint resolution would reaffirm the unbroken intent of Congress that the usual common-law rules, *realistically applied*, shall continue to be used to determine whether a person is an 'employee' for purposes of applying the Social Security Act." (Italics added.)

Paragraph six reads:

"The pending resolution would not disturb the existing Treasury regulation which construes the term 'employee' in the Social Security Act harmoniously with the usual common-law rules."

Concerning "employees" the existing regulations, Title 26 Code of Federal Regulations, Cumulative Supplement, Chapter 1, No. 403.204 and 402.204, read in part as follows:

"Who are employees.—Every individual is an employee if the relationship between him and person for whom he performs services is the legal relationship of employer and employee.

"Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and

means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing service as an independent contractor is not as to such services an employee."

By the language "usual common-law rules", employed in H.J.Res. 296, the Congress did not intend that the "common-law rules" of the several states should govern, as we are dealing with a federal act covering a federal problem, and to apply the varying interpretations placed by the several States upon the "employer-employee" relationship would be inconsistent with the ends to be achieved and the purposes to be accomplished by Social Security Legislation. Of course, the existence of the relationship is a question of fact, and the difference in the facts of various cases probably accounts to a large extent for the "varying interpretations" of the several States, but in any event, by its approval of the existing regulations on the subject and with the amendment of the Social Security Legislation by H. J. Res. 296, Congress has established a standard, to be realistically applied, for the guidance of federal courts in reaching a conclusion on the problem, irrespective of the "common-law rules" of the various States.

The common law should never be entirely stationary, but should be molded by construction, analogy and custom so as to embrace new relations, and to enable the courts in applying the common law to keep abreast of the exigencies of current problems and necessities. In this fashion only can substantial justice be administered and realistic results accomplished.

Therefore, this court will look to the provisions of the existing regulations on "employees" for the "usual common-law rules" to be used and applied by the court in determining whether these contractors and their employees were in fact and within the meaning of the Social Security Act employees of the plaintiff, but will apply those "rules" realistically, and ascertain as a matter of actual reality whether the plaintiff controlled or had the right to control the means of performing the services rendered as well as the result accomplished. This construction is consistent with the principle of the Silk and Bartels cases, that of giving the interpretation to the language of Congress that will effectuate the purposes of the Act under consideration, and those considerations advanced by the Supreme Court, opportunities for profit or loss, investment in facilities, permanency of relation and skill required, should still be considered in arriving at the final determination of whether as a matter of actual reality there exists such control or right of control as required by the common law. This is only a common sense approach to the problem and is what this court conceives to be the intent of Congress in passing H. J. Res. 296. Certainly, in a proper case an employer should be required to pay social security taxes, and any other than a realistic approach to the problem would defeat the purposes of the legislation and "invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation".

The question here presented is what was the status of the contractors and their helpers, in view of the applicable law and realistic consideration of the facts?

It must be borne in mind at all times that the plaintiff is operating under a sustained yield program, which calls for scientific planning and cutting with an end in view of promoting maximum conservation and an adequate supply of timber at a cost commensurate with the value of the raw materials. The desired results were mat-

ters of common knowledge to all parties, and the planning, marking of the tracts, spotting of trees, furnishing of specifications, published rate schedule, and the supervision of the contractor's work for violations of sound forestry practices were all necessary and integral parts of the program. In exercising the above designated functions the plaintiff was controlling, or had the right to control, the contractors and their men only as to the results to be accomplished as distinguished from the ways and means of accomplishing the results. As to the details and means of performing the actual cutting and hauling, the function of the contractors and their men, the plaintiff did not exercise such control so as to render the relationship one of "employer-employee".

Under different circumstances, the realistic approach to this situation might compel an opposite conclusion, but again the court emphasizes the program employed by plaintiff, its aims or desired results, and the fact that such were matters of common knowledge to all concerned.

The fact that a rate of pay was published by the plaintiff and was not the result of open bargaining between the parties in the first instance, is, of course, worthy of consideration along with all other facts, but when looked at in the following manner is not persuasive. In effect it amounts to this. The plaintiff, in line with the above mentioned operating program, had the facilities and data at hand to accurately compute a rate that was desirable to it and which contained a profit margin for the contractors. In effect the plaintiff said, "I have some timber to be cut and hauled and I will pay this price for the job." The contractor could accept or refuse this offer as he desired. If he felt that he could not accept the offered rate, the facts are that the plaintiff would negotiate with him and listen to his reasons, and often times as the result of such negotiations adjustments in the rates were made. Of course, if a contractor did not agree with the sufficiency of the offered rate and could not after negotiating with the plaintiff agree upon a rate, he either had to take the contract on plaintiff's terms or not take it at all, but that cannot sustain a find-

ing of such common law control as to make the contractor an employee, for such is true of "arm's length" dealings in any business transaction.

The provision of the contract requiring the contractors to make available for inspection their records of wages paid the men helping them and the hours worked weekly was inserted for the protection of the plaintiff, and was placed in the contract upon the advice of counsel and government officials as being the only effective means of insuring that plaintiff would be able to ship its goods in interstate commerce. Again, this is just another fact to be considered.

The three day cancellation clause of the contract is important but is in no sense controlling. It can be strongly asserted that by the presence of this clause in the contract, even though the evidence discloses no instance of its use by the plaintiff as a club over the contractors, the plaintiff at least had the right to exercise a very extensive control over the contractor, the right of almost immediate discharge. However, when this is considered in the light of the sustained yield program as discussed above, it is entirely consistent with the other supervisory functions, all of which are necessary to realize the desired results of the program, and to insure as nearly as practicable that the contractors and their helpers follow sound forestry practices, such as not cutting or destroying timber that had not been spotted for removal.

As to the details and means of performing the work, the contractors employed and discharged their own men and paid their wages. The plaintiff did not dictate the number to be employed or that any particular individual be employed, and in fact, the plaintiff had no record whatsoever of the contractor's employees. Many of the men worked only part time with the contractors, spending the remainder of their time working on their farms or at other jobs.

Contractors furnished and maintained their own equipment, worked their own hours and planned their cutting and hauling operations. Many had a considerable

outlay in equipment, and the minimum investment in tools and equipment was $2,000.00 to $3,000.00.

Although the net earnings of the average contractor were not enormous, any profit realized from the operations belonged to the contractors and not the plaintiff, and any loss sustained was the contractor's loss and not the plaintiff's loss.

As heretofore stated, the plaintiff has been operating under the sustained yield program, and thus dealing with contractors, from 1934, the date of the change over from the "logging camp" system. Therefore, even though oral instead of written contracts were used until 1938, this was no new arrangement conceived by the plaintiff to avoid social security taxes. There is no evidence which will warrant an inference that this was an adroit scheme for avoidance.

When all the facts of this case are considered, and the law applied in the manner heretofore indicated, it is the opinion of the court that there did not exist such common-law control as to the details and means of performing the services rendered as is contemplated by the Social Security Legislation, as amended by H. J. Res. 296, and therefore, these contractors and the men employed by them were not employees of the plaintiff within the meaning of the Acts under consideration.