**UNITED STATES of America,
Appellant,**

v.

**Minnie E. THORSON et al., Appellees.**
**No. 5567.**

United States Court of Appeals
First Circuit.

Heard Jan. 5, 1960.

Decided Sept. 8, 1960.

158

George F. Lynch, Atty., Dept. of Justice, Washington, D. C., with whom Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Philip R. Miller, Attys., Dept. of Justice, Washington, D. C.. and Elliott L. Richardson, U. S. Atty., and Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass., were on brief, for appellant.

Joseph J. Lyman, Washington, D. C., with whom Robert F. White, Boston, Mass., was on the brief, for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

This is an appeal from a judgment entered for the plaintiffs in an action to recover federal insurance contribution taxes and federal unemployment taxes alleged to have been erroneously paid between June 30, 1952, and December 31, 1954, on the earnings of workers known as •"applicators." The single question presented is whether these "applicators" were "employees" of the taxpayers-plaintiffs within the meaning of that word as used in § 1426(d) (1) and (2) and § 1607(i) of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 1426(d) (1, 2), 1607(i), as they read after amendment during the period involved.

Both Acts impose taxes upon employers measured by the compensation paid to employees. And the definition of employees in the Acts as they stood amended at the critical time was for our purposes the same. Section 1426(d) (1) and (2) read:

> "The term 'employee' means—
>
> "(1)   any officer of a corporation; or
>
> "(2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee; or   *   *   *."[1]

And § 1607(i) read:

> "The term 'employee' includes an officer of a corporation, but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules."

■   The wording of these provisions indicates that Congress intended that the employment relationship be decided by application of the rules of the common law with specific reference to the common-law distinction, hard as it sometimes is to draw, between an employee and an independent contractor. And the legislative history of the sections not only substantiates but clearly and definitely emphasizes that Congress intended the words it used to mean exactly what they say.

Both sections as originally enacted defined "employee" in identical language. The definition of "employee" found in § 1101(a) (6) of the Social Security Act (49 Stat. 620, 647) was carried over to §§ 1426 and 1607 of the Internal Revenue Code of 1939 (53 Stat. 1). This defini-

---

1. Succeeding subsections specifically include in the category of employees persons engaged in a number of quite irrelevant occupations such as agent or commission drivers distributing specified products, full time life insurance salesmen, certain home workers and traveling salesmen.

tion merely provided: "The term 'employee' includes an officer of a corporation." Leaving definition of the term otherwise at large, it might have been assumed that it would be given its common-law meaning. Varying tests, however having been applied in the lower federal courts to determine who were employees under the Social Security Act, the Supreme Court granted certiorari in United States v. Silk, 10 Cir., 1946, 155 F.2d 356, and in Greyvan Lines, Inc., v. Harrison, 7 Cir., 1946, 156 F. 2d 412, to resolve the conflict. Although the results reached are consistent with application of common-law principles, in a single opinion, United States v. Silk, 1947, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757, the Court adopted a broad definition of the term "employee" to effectuate as it thought the broadly remedial purposes of the Act. Saying that "the generality of the employment definitions indicates that the terms 'employment' and 'employee,' are to be construed to accomplish the purpose of the legislation," the Court said at page 712 of 331 U.S., at page 1467 of 67 S.Ct.: "As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose. Such an interpretation would only make for a continuance, to a considerable degree, of the difficulties for which the remedy was devised and would invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation." The Court accordingly rejected the common-law test of control in favor of the test of "economic reality." Later that year in the case of Bartels v. Birmingham, 1947, 332 U.S. 126, at page 130, 67 S.Ct. 1547, at page 1549, 91 L.Ed. 1947, the Court, again speaking through Mr. Justice Reed, made its position entirely clear when it said:

"In United States v. Silk, supra, we held that the relationship of employer-employee, which determines the liability for employment taxes under the Social Security Act was not to be determined solely by the idea of control which an alleged employer may or could exercise over the details of the service rendered to his business by the worker or workers. Obviously control is characteristically associated with the employer-employee relationship, but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service. In Silk, we pointed out that permanency of the relation, the skill required, the investment in the facilities for work, and opportunities for profit or loss from the activities were also factors that should enter into judicial determination as to the coverage of the Social Security Act. It is the total situation that controls."

Prompted by these decisions the Treasury Department at once set about the preparation of new regulations to embody the test of "economic reality" viewed in the light of the "total situation" instead of the narrower common-law test of power to control the manner in which the work should be done. The Congress, however, promptly reacted sharply to this administrative undertaking. Senate Report No. 1255, 80th Congress, Second Session, in substance repeating House Report No. 1319 of February 3, 1948, which accompanied legislation which eventually passed as House Joint Resolution 296, 62 Stat. 438, amending both § 1426(d)[2] and § 1607(i) to the form of § 1607(i) of the Internal Revenue Code of 1939, as quoted above, indicates very clearly that Congress was gravely concerned not only over what it regarded as administrative usurpation of its prerogative of definition, but also over the probability that the broader "economic reality" in the light of the "total situation" test would both prove unworkably

3. Section 1426(d) was given its form as quoted above by amendment in 1950, 64 Stat. 536.

vague and also would sweep so many people into the coverage of the Act that the trust fund established by § 201(a) of the Act would be dissipated. This legislative history is to be found in 2 U.S. Code Congressional Service, 1948, p. 1752 et seq.

It is far too long to repeat. The following exerpts therefrom will have to suffice. In general the Report notes that the proposed Joint Resolution would accomplish the following results:

"1. The joint resolution would reaffirm the unbroken intent of Congress that the usual common-law rules, realistically applied, shall continue to be used to determine whether a person is an 'employee' for purposes of applying the Social Security Act.

\*   \*   \*   \*   \*   \*

"4. The resolution would stop extension of coverage of the act to between a half and three-quarters of a million persons who have not been, are not now, and should not be under the act, until coverage is provided by act of the Congress.

"5. The resolution would stop the plan of the Treasury Department to give to these 500,000–750,000 persons free, retroactive coverage, and thus would stop a more than one-hundred-million-dollar impairment of the old-age and survivors' insurance trust fund which has been built up out of taxes collected on the wages of those who are truly 'employees' and who have paid for their coverage under the system.

\*   \*   \*   \*   \*   \*

"8. The resolution preserves the integrity of the trust fund by limiting payments out of the fund to persons who are 'employees' under the act by the usual common-law rules, realistically applied. It leaves to Congress the opportunity to provide coverage for independent contractors and the self-employed, who are not 'employees' under the act, or to those who are 'employees' and are now expressly excluded from the coverage of the act." At page 1753.

With specific reference to the new regulation proposed by the Department of the Treasury, the report comments as follows:

"The proposed regulation discards the common-law rules for distinguishing the employer-employee relationship distilled from many decisions by many courts out of many insights of real situations, for a new rule of nebulous character.

"Under the proposed regulation an 'employee' is 'an individual in a service relationship who is dependent as a matter of economic reality upon the business to which he renders service and not upon his own business as an independent contractor.'

"The rule, obviously, will not serve to make the necessary distinctions. Who, in this whole world engaged in any sort of service relationship, is not dependent as a matter of economic reality on some other person? The corner grocer clearly not an employee, is economically dependent upon his customers, his banker, his supplier. No, the economic reality test must be given sharper meanings \*   \*   \*." (at page 1762).

\*   \*   \*   \*   \*   \*

" \*   \*   \* The persons upon whom the proposed regulation would impose the duties and liabilities of the act—among the latter liabilities for taxes, and civil and criminal penalties that may involve imprisonment for felony—are provided no stated rule by which to determine their obligations, and must guess themselves to be subject to the uncertain language of the regulation or be at their peril. Whether persons have the rights and obligations of coverage is made by the regulation to depend entirely upon administrative findings and determinations." At page 1763.

With respect to the decisions of the Supreme Court in the Silk, Greyvan and Bartels cases, supra, the report contains these comments:

"A sound reading of these cases requires that the prefatory and random remarks of the Court which have been seized upon to supply a spurious gloss of validity to the proposed Treasury regulation shall be harmoniously related to the facts involved, the decisions, and to their moving rules; and if this cannot be done they must be regarded as surplusage.

"If we were compelled to interpret these remarks of the Court we would say, in untechnical and summary fashion and without aiming at complete exposition, that the lower courts and administrative agencies were told: Don't be fooled or unduly influenced by the form of the arrangement to which you must apply the Social Security Act. Look to the real substance. Illuminate the usual common-law control tests by regard for all the pertinent facts. This requires that all of the reali-

ties that will lead you to the truth must be consulted and weighed along with all other significant indicators of the real substance of the arrangement.

"But this again should be said: If we have misinterpreted these decisions of the Supreme Court, if we have incorrectly called the real moving principles of these cases, if the Treasury's interpretations and the proposed regulation based upon them are correct, then by this resolution we propose to restore the usual common-law rules, realistically applied." At page 1769.

The legislation which this report accompanied passed both houses of Congress but was vetoed by the President on the ground that the amendments therein proposed would exclude some 750,000 persons from the benefits of the Social Security Act. Nevertheless, Congress passed the joint resolution over the President's veto and it became Public Law No. 642, 80th Congress, Second Session, 62 Stat. 438.[3]

The clear language of the statutes as quoted earlier in this opinion viewed in

---

3. Representative Gearhart, who was in charge of the motion to pass the resolution over the President's veto, made the following statement with respect to the opinions of the Supreme Court cited above and the proposed Treasury regulation, which we think it material to quote. See Party Cab Co. v. United States, 7 Cir., 1949, 172 F.2d 87, 90-91, 10 A.L.R. 2d 358.

"However, there crept into these decisions a little of what lawyers call obiter dicta; that is, some words which were quite unnecessary to the result. These words were to the effect that, for purposes of social security, the Social Security Administration was not necessarily bound in extending the social-security coverage, by the ancient common-law definition of master and servant, or employer and employee, as you may choose to call it, but that they could take into the system as employees any persons who were dependent upon a business in the light of economic realities, thereby throwing into the entire system a confusion which required immediate legislative attention.

"The Social Security Administration and the Treasury proceeded immediately to prepare a departmental regulation to carry that obiter dicta definition into effect. If this Congress had not interfered, tens of thousand of people in America who never dreamed they were employed by anybody and never for one moment thought they were covered by social security or subject to payroll taxes would have found that they had been swept into the social-security system by bureaucratic ukase. In other words, they would suddenly have found that they had more employers than a dog had fleas. So, to end this confusion, this Congress acted promptly, and, after thoroughgoing debate, and by a vote of nearly 7 to 1, proceeded by legislation to put the matter in order once again by restoring the ancient doctrine of the common law defining the relation of master and servant, employer and employee." Congressional Record Vol. 94, Pages 8268-8269, (advance part) June 14, 1948.

the light of the foregoing legislative history can leave no room whatever to doubt that the court's ·function in cases like this is realistically to apply the common-law test in deciding whether the "applicators" with which we are concerned are employees of the taxpayers or whether their relationship to the taxpayers is that of independent contractors.

We turn now to the facts as found by the court below which the United States concedes "are in the main—though not entirely—accurate so far as they go."

During the period with which we are concerned, the plaintiffs-appellees, Robert M. and Minnie E. Thorson, were engaged in the home improvement business as a partnership called Thor Roofing Company. Their business consisted of providing and seeing to the application of roofing and siding materials for dwelling houses and other buildings. They employed salesmen on a commission basis, office workers, truck drivers and a superintendent on a salary basis, and some workmen on an hourly basis. The latter worked regular hours, were transported to and from work and were supplied with tools. Although occasionally they did the same kind of work as the applicators in that they might do a job that no applicator wished to undertake, or complete a job that an applicator for some reason left unfinished, they were used ordinarily on repair jobs and flat roofing which called for different techniques than those used in applying slope roofing or siding. We are not concerned with any of those employees. Our only concern is with the applicators who put on the siding and slope roofing.

These men were paid on the basis of a fixed rate for each unit, known as a square (100 square feet), of roofing or siding they applied. While a fixed rate was paid for straight away work, certain jobs known as "cut up" jobs which required extra work cutting and fitting materials because of irregularities, such as dormer windows, in the shape of the building involved, were paid at a rate negotiated for each such job by an applicator and the taxpayers' superintendent. If no agreement could be reached with one applicator the superintendent would negotiate with another or as a final resort do the job with hourly paid employees.

An applicator did not have to take any job offered him. If he refused one job he would ordinarily be offered another if it were available. When an applicator finished a job he usually returned to the taxpayers' office for another but he was under no obligation to do so and, indeed, applicators could and sometimes did go to work for competitors of the plaintiffs and later return to work for the plaintiffs again. The applicators did not agree to work regularly for the plaintiffs nor did the plaintiffs agree to keep the applicators supplied with work for any given period of time. Their only obligation was to complete a job once they had undertaken it and once assigned to a job they were rarely if ever shifted to another until it was finished.

The applicators had no specified working hours but to make good money they had to and ordinarily did put in a full day's work. They traveled to and from their work at their own expense although they might be reimbursed for extra travel expense if the job was outside the area served by the Metropolitan Transit Authority. They drew their pay for each job when it was finished, but at the end of each week they could draw partial payment on an unfinished job for the part of the work they stated had been done.

Small jobs were done by an applicator working alone. On larger jobs the superintendent arranged to have two or more men work together, but these arrangements were always made with the consent of the men involved. Some applicators had regular partners, others sometimes hired helpers of their own choice. In all cases in which men worked together payment for the job was divided among them by agreement of the men themselves.

Sometimes a building owner asked an applicator to do work not included in the

contract. In this situation, particularly when the work consisted only of minor repairs the applicator did the work on his own account without notifying the plaintiffs and was paid directly by the owner. Otherwise he notified the plaintiffs and a further contract was arranged between them and the owner and a work order issued for the work. When other home owners inquired of an applicator about having roofing or siding work done for them, the applicator would refer them to the plaintiffs and if a contract resulted a commission would be paid the applicator.

The plaintiffs' superintendent issued work orders to the applicators, saw that the necessary materials, ladders and staging were delivered to each job site, and visited the jobs from time to time. He might never visit a short job at all but might visit a long job as many as three or four times. He made these visits to see that the job was being done in accordance with the contract with the home owner and if it was not, as occasionally was the case, he directed that the part of the work not complying with contract requirements be removed by the applicator and done over. All the applicators were experienced in their work and there was no need to give them any directions as to the specific methods to be used in putting on siding or slope roofing. To collect his final pay for a job the applicator had to obtain the signature of the owner to a certificate that the work had been satisfactorily completed in accordance with the contract.

The plaintiffs provided the materials for the work and the staging and ladders used by the applicators which it delivered to each job. At the end of each job the plaintiffs removed their equipment, any unused materials, and whatever rubbish may have resulted from the work, which the applicator was required to gather into piles. Each applicator supplied his own tools, ordinarily only a hammer, saw and

knife were needed, but if he did not have a necessary tool he could borrow one from the plaintiffs.

The plaintiffs obtained whatever building permits might be required, and provided workmen's compensation insurance for its piece work applicators. Also, membership was open to the applicators in the Blue Cross-Blue Shield group for the plaintiffs' employees and a few of them joined it.

The court below ruled that the common-law test applied to determine whether the applicators were employees of the plaintiffs or independent contractors. And it ruled that the common-law test was that stated in the applicable Treasury Regulations[4] which provided:

"Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.

"Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished."

The question is whether the court correctly applied this test to the facts before it. In doing so the court said:

"It is clear that in fact no actual control over means and details was exercised. This, of course, is not decisive of the issue as to the right to exercise such control, since an employer dealing with experienced workers who know how to do the work might have little occasion to exercise such control. There was no express agreement spelling out the extent to which plaintiffs had control over the work, nor does there appear to be any single factor which

---

4. Section 408.204 of Treasury Regulation 128 promulgated under the Federal Insurance Contributions Act, and § 403.204 of Treasury Regulations 107 promulgated under the Federal Unemployment Tax Act are the same in all material respects.

decisively settles the issue. The question resolves itself into one of drawing a conclusion from the situation as a whole as to what sort of relationship the parties intended to establish. The picture presented is one of a relationship in which plaintiffs were interested only in the result accomplished, that is, the completion of the work in accordance with their contract with the building owner."

There is ample evidence to support these findings of the District Court. Other findings might have been made on the evidence adduced, but since we cannot say that those which were made are "clearly erroneous," we must accept them under the mandate of Rule 52(a) F.R.Civ.P., 28 U.S.C.A. And, accepting these findings, the ultimate conclusion that the relationship of the applicators to the plaintiffs was that of independent contractors, not employees, necessarily follows.

The Government undertakes to challenge this conclusion on a number of grounds. Its basic contention that the applicators were in fact subject to the plaintiffs' control as to the details of their work, and that such control was actually exercised, flies in the face of the District Court's clear finding, which, as we have said, is supported by adequate evidence. Perhaps on the evidence the court below might have found otherwise. But be that as it may, its finding is what controls provided the finding, as here, has adequate evidentiary support.

The Government makes a number of other contentions. It says that the court's finding that once assigned to a job an applicator could not be shifted to another is directly contrary to the testimony of the plaintiffs' superintendent who said that he had authority to transfer an applicator from one job to another in an emergency. This contention ignores the further testimony of the superintendent that when such a shift was made the applicator worked for the plaintiff as an hourly paid employee, as applicators sometimes did in other situations, and there is no dispute that the plaintiffs paid, and do not seek to recover, taxes paid on the wages of all hourly paid employees, including applicators, when working on that basis.

Nor does the evidence support the Government's contention that the employee-employer relationship is clearly indicated by the undisputed testimony of the taxpayers' superintendent that he had the right to discharge an applicator, for he did not so testify. All that appears in the record and all that the Government relies upon to support its contention is the testimony of the taxpayers' superintendent who said in substance that he had the right not to give an applicator another job if for any reason he did not choose to do so. This is not the equivalent of evidence of a right to fire an applicator from a job once he had begun work on it. It is only evidence of the right not to enter into another contract.

Other contentions of the Government rest on facts not found by the court below but which the Government says are compelled by the evidence. As to those contentions it will suffice to say either that we do not find the facts on which a contention is asserted to rest required by the evidence, or else that even if found, the fact would not compel a different conclusion.

The findings and conclusion in this case are in accord with the findings and conclusions reached in three other cases in this circuit involving applicators. Metropolitan Roofing & Modernizing Co. v. United States, D.C.Mass.1954, 125 F. Supp. 670; Jagolinzer v. United States, D.C.R.I.1957, 150 F.Supp. 489; American Homes of New England Inc. v. United States, D.C.Mass.1959, 173 F. Supp. 857. In another case, Security Roofing & Construction Co. v. United States, D.C.Mass.1958, 163 F. Supp. 794, however, a different conclusion was reached, but on quite different findings of fact. In that case it was found that the taxpayer-plaintiff could take an applicator off one job and move him to another, apparently working under the same piecework pay arrangement, and that also on

occasion it split up a team working on one job to send one member of the team to another job, a practice as to which there is no evidence whatever in the case at bar. Moreover, in the latter case it was found that in the event extra work turned up in the course of a job the applicator was not allowed to contract to do it for the householder on his own account, as in the case at bar, but was required to ask the taxpayer-plaintiff for instructions as to how to proceed. These facts, and others we might mention, differentiate the Security Roofing case from the one now before us.

The case at bar is consistent with the Metropolitan Roofing, Jagolinzer and American Homes cases cited above and not inconsistent with Security Roofing.

A judgment will be entered affirming the judgment of the District Court.