CAPITAL TRAWLERS, INC., et al.

v.

UNITED STATES of America.

CUMBERLAND FISHERIES, INC., et al.

v.

UNITED STATES of America.

Civ. Nos. 7-63 and 7-64.

United States District Court
D. Maine, S. D.
April 4, 1963.

Philip G. Willard (No.7–63 only), Benjamin Thompson (No. 7–64 only), Portland, Me., Joseph J. Lyman (both cases), Washington, D. C., for plaintiffs.

Alton A. Lessard, U. S. Atty., Portland, Me., Rufus E. Stetson, Jr., Atty., U. S. Dept. of Justice, Tax Div., Washington, D. C., for defendant.

GIGNOUX, District Judge.

These are actions under 28 U.S.C. § 1346(a) (1) to recover Federal Insurance Contributions Taxes and Federal Unemployment Taxes, alleged to have been erroneously paid by and unlawfully collected from plaintiffs for the years 1957 through 1960, with respect to the earnings of the captains and members of the crews of commercial fishing vessels owned by plaintiffs. The sole issue is whether or not the captains and members of the crews (other than the engineers) of the vessels involved were "employees" of plaintiffs within the meaning of Sections 3121(d) (2) and 3306(i) of the Internal Revenue Code of 1954, 26 U.S.C. §§ 3121(d) (2) and 3306(i), and the applicable regulations issued thereunder. Treas.Regs. 31.3121(d)–1(c) and 31.3306 (i)–1. By stipulation of the parties, the actions were consolidated for trial by the Court, without jury.

Having duly considered the evidence presented by the parties, the pleadings and stipulations on file, and the written briefs and oral arguments submitted by the parties, the Court now makes its findings of fact and conclusions of law, and directs entry of its judgments, in accordance with Fed.R.Civ.P. 52, as follows:

## FINDINGS OF FACT

1. Plaintiffs are corporations duly incorporated and existing under the laws of the State of Maine, and during the years 1957 through 1960 owned a number of commercial fishing vessels, which operated out of Portland, Maine. The stock ownership and officers of plaintiffs in Civil Action No. 7–63 (hereinafter called "the Willard Group") are either identical or overlapping. The stock ownership and officers of plaintiffs in Civil Action No. 7–64 (hereinafter called "the Harris Group") are either identical or overlapping.

2. The business of each plaintiff, except plaintiffs Willard-Daggett, Inc. and Harris Company, Inc., was confined to the ownership and operation of a single vessel owned by it.[1] Each of the vessels was an American vessel in excess of ten gross tons, and was manned by a crew of 4 to 7 men, including a captain and a chief engineer, the number of the crew depending on the size of the vessel.

3. Each of plaintiffs' vessels was operated on what is known as the "60–40 lay" basis, in accordance with the long-standing custom in the fishing industry in this area. Under that system, a settlement is made between the owner and the fishermen after each trip.[2] From the total proceeds received from the sale of the fish brought in on the trip, there are first deducted the engineer's bonus, or "per", radar rental, fathometer rental, and the cost of chart paper. The balance, which is known as the "gross stock", is then divided into two shares, 60% to the captain and crew and 40% to the owner. Of the owner's 40%, 10% is paid to the captain as his commission. From the crew's share are deducted the operating expenses of the trip, which include the cost of groceries, fuel, lubricants, ice, the cook's bonus, the tallyman's fee, the "lumpers" wages,[3] and, in the case of the Willard Group, $25 for the shore captain.[4] The remainder of the crew's share is divided equally among the members of the crew, including the captain.

4. All bookkeeping in connection with a settlement was done in the office of the owner. The owner received payment of the proceeds of the catch from the purchaser; paid all the bills for operating expenses and supplies; and paid the captain and crew members directly, either by cash or by check, after first making deductions for withholding of federal income and social security taxes.

5. The captain and crew members received no guaranty from the owner as to the amounts they would earn on a trip. However, in the event of an unsuccessful

---

1. Plaintiff Willard-Daggett, Inc. owned and operated a single vessel, and plaintiff Harris Company, Inc. owned and operated two vessels. The business of these two plaintiffs was not limited to the ownership and operation of these vessels.

2. On some occasions, when catches are small, two or three trips are treated together for settlement purposes.

3. The "lumpers" were shore personnel who helped unload the fish at the dock. Their status is not involved in these cases.

4. The Willard Group and the Harris Group each employed a shore captain, who was charged with the responsibility of equip-ping and maintaining the boats, overseeing their operation, and hiring the captains. In both instances he was an officer of one or more of plaintiffs. The shore captain employed by the Willard Group was paid $50 per trip, ½ from the crew's share and ½ from the owner's share of the lay. He also received a commission upon all fuel purchased by the Willard Group vessels from Central Wharf Oil Supply Co., an affiliated oil supply company, from which it was "presumed" the vessels would obtain their fuel. The shore captain employed by the Harris Group was paid a salary by the Harris Group and received nothing from the crew's share of the lay.

trip, known as a "broker", it was the practice of all plaintiffs to pay each man $50, if they were satisfied that a reasonable effort had been made to produce a satisfactory catch. The record does not indicate clearly whether these payments or any other loss from such a trip was borne by plaintiffs or was carried over by them to the next trip.

6. It was the practice of all plaintiffs to advance money to the fishermen and their families against the anticipated proceeds of future trips.

7. Plaintiffs equipped and maintained the vessels and furnished the gear used in the fishing operation, other than the fishermen's individual clothing, bedding, and personal equipment. They hired the captains on the basis of their experience, reliability and navigational skill. Once selected, the captain took the ship's papers to the U. S. Customs House and signed on as captain of the vessel. The arrangement between the owner and a captain was entirely oral. There was usually no discussion as to pay, since the customary 60–40 lay basis was generally understood. Nor was any fixed term specified, it being understood that either party could terminate the relationship at any time, with or without cause. A captain could expect to remain with a boat, from trip to trip and from season to season, for as long as he produced and performed in a manner satisfactory to the owner. In practice, the captains have continued aboard plaintiffs' vessels for extended periods of time, in one instance 21 years. A captain of a smaller vessel usually moved up to a larger vessel when a vacancy occurred. There is no question but that plaintiffs retained the right to discharge a captain at any time, and in at least one instance a plaintiff did discharge a captain who was not available for a trip. If a captain wanted to stay ashore for a trip, he would obtain the owner's consent and find a replacement satisfactory to the owner.

8. Generally, there was no discussion between the owner and a newly-hired captain as to how the latter should perform his job, the primary requirement being that the captain perform to the best of his ability. Generally, the captain determined where the vessel would go to fish, how it would fish, and when it would return from its voyage, and no attempt was made by the owner to interfere with the captain's discretion in this respect. However, the owner required that the boat sail within a reasonable time, usually about four days, after its return to port. The captain also followed the owner's instructions when given and considered that the owner had the authority to give him instructions concerning such matters as when to leave port, when to haul the vessel, compliance with government regulations,[5] drinking aboard the vessel,[6] where to purchase supplies,[7] and where to sell the catch.[8] During a trip, which might last from several days to three weeks, the captain only infrequently communicated with the owner or with others on shore, except in the event of an emergency. On the trip in, it was also customary for the captain to call either the owner or the fish company which was to buy the catch for the purpose of informing those ashore when to expect the vessel, and, on occasion, for the purpose of inquiring as to the current prices for fish.

9. Usually, the captain was free to negotiate the sale of the catch wherever he

5. Plaintiffs, from time to time, informed the captains of various governmental regulations governing the conduct of fishing operations and instructed them that these were to be obeyed. In at least one instance, the owner paid a $100 fine imposed upon a captain for illegal fishing, indicating that no reimbursement was expected and that it was "all right the first time."

Plaintiffs also furnished any bonds required when their vessels landed in Canadian ports.

6. The owners made it clear that there was to be no drinking on board their vessels.

7. See paragraph 10 and note 10 infra.

8. See paragraph 9 and note 9 infra.

wished.[9] Generally, the boats returned to Portland and sold their catches to the same fish companies each time, but, on occasion, the catch was sold in Rockland, Maine or Gloucester, Massachusetts for a better market. The captains customarily arranged prior to their departure for the sale of the catch, and usually plaintiffs knew where the catch was to be sold. The vessels were unloaded at the buyer's plant under the captains' supervision. The buyer customarily sent payment for the catch directly to the office of the owner.

10. The captain, with the assistance of his engineer and cook, arranged to procure supplies for a trip, such as fuel oil, groceries, and ice. However, it was "understood" that certain supplies, such as fuel oil and groceries, would be purchased from sources affiliated with the owner.[10] The bills for all supplies were forwarded to and paid by the owner and then charged against the crew's share of the lay.

11. With the exception of the engineers,[11] the captain hired the individual members of his crew. He had the power to hire and fire the crew members. Although there was only slight evidence that the owners ever interfered in this matter, it is clear that they had the right to do so.[12] Upon occasion, a captain hired a crew member who had been "sent down" by the owner at the captain's re-

quest. The owner officially learned the names of the crew members only at the completion of a trip when the captain turned in a roster for pay purposes, although the owners usually knew of the regular crew members serving on their vessels. In practice, crew members remained with a boat for repeated voyages.

12. While at sea, the captain had the usual captain's power to direct the crew and to exercise in other ways a master's authority.

13. While in port, the fishermen could do as they saw fit. As a rule, any work done by them in port, such as painting and repairing the vessels,[13] was voluntary, and they were paid by plaintiffs for such work. However, the fishermen were required by plaintiffs' shore captains to do some work aboard the vessels after their return to port, such as the removal of nets and doors, minor repairs to the nets and rigging, and cleaning. There was no additional payment for this work.

14. Plaintiffs carried and paid for all insurance, including protection and indemnity insurance, necessary for the protection of their vessels and the fishermen.[14] This insurance protected plaintiffs against suits by fishermen who were injured while on one of their vessels. At various times, claims were made on account of accidents to captains and mem-

9. In one instance, a Harris Group captain was required to sell his catch to Fulham Bros. for several months. Fulham Bros. had sold the boat to one of the Harris Group and had imposed this requirement as a condition of the sale.

10. Thus, all Harris Group vessels customarily bought groceries from the Harris Company and fuel oil from the Harris Oil Company, both corporations affiliated with the Harris Group. The Willard Group vessels customarily purchased fuel oil from the Central Wharf Oil Supply Co., which was affiliated with the Willard Group. See note 4 supra.

11. It is conceded that the engineers were employees of plaintiffs. They were hired by plaintiffs in the same manner as the captains. The Harris Group engineers

were paid a regular crew member's share of the lay, plus a $15 "per" out of the gross stock. The Willard Group engineers were entitled to a regular crew's share of the lay, but were guaranteed a weekly wage of at least $100 by the owner. In practice, they were paid the $100 weekly wage.

12. One of the Harris Group captains testified that in at least one instance, before hiring a fisherman he felt might be undependable, he had consulted with the shore captain because "He hired me and I figured he is my boss."

13. The vessels were hauled by plaintiffs at least once a year for this purpose.

14. Neither the captains nor the crew members carried any such insurance.

444

bers of the crews of the vessels. These claims were presented to plaintiffs' insurance carrier and were settled by such insurance carrier. The captains filed with plaintiffs reports of any such accidents upon their return to port, and plaintiffs forwarded these reports to their insurance carriers. Fishermen injured aboard ship were customarily treated by the same doctor, who was paid for his services by the insurance carrier.

15. Plaintiffs reported the captains and members of the crews of the vessels owned by them as their employees under the applicable provisions of the federal income tax laws, the Federal Insurance Contributions Act, the Federal Unemployment Tax Act, and like statutes. Before making any payments to the captains and crew members, plaintiffs withheld federal income and social security taxes.

16. The captains of plaintiffs' vessels did not report themselves as employers, or as self-employers, under the federal income tax laws, the Federal Insurance Contributions Act, the Federal Unemployment Tax Act, and like statutes.

17. The captains and members of the crews of plaintiffs' vessels regarded themselves as in the employ of plaintiffs.

18. Plaintiffs retained, and on occasion exercised, the right to control and direct the captains and members of the crews of plaintiffs' vessels, both as to the result to be accomplished by the work to be done by them and as to the manner by which that result was to be accomplished. Plaintiffs' control and direction of the captains was exercised directly, generally through plaintiffs' shore captains. Plaintiffs' control and direction of the crew members was exercised both directly, generally through plaintiffs' shore captains, and indirectly, through the captains.

19. Plaintiffs filed the required tax returns and paid the Federal Insurance Contributions Taxes and Federal Unemployment Taxes with respect to the earnings of the captains and members of the crews of the vessels owned by them, for the years 1957 through 1960, as set forth in the complaints in these actions, and filed timely claims for refund of their portions of the taxes so paid, which were disallowed by the Commissioner of Internal Revenue.

20. These actions were timely filed.

DISCUSSION

Sections 3121(d) (2) and 3306(i) of the Internal Revenue Code of 1954, 26 U.S.C. §§ 3121(d) (2) and 3306(i) specifically adopt the common-law test for determining the existence of an employment relationship for the purposes of the Federal Insurance Contributions Act, 26 U.S.C. § 3101 et seq., and the Federal Unemployment Tax Act, 26 U.S.C. § 3301 et seq. Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 3, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962); United States v. Thorson, 282 F.2d 157 (1st Cir., 1960).

The parties agree that the common-law test is correctly stated in Treas.Regs. §§ 31.3121(d)–1(c) and 31.3306(i)–1, which provide, in pertinent part:

"§ 31.3121(d)–1(c) (2). Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not neces-

sarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services." United States v. Thorson, supra. And see Restatement, Agency (Second) § 220 (1958).

■ It is clear that no single factor is controlling in determining the existence of an employer-employee relationship under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act. United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947). The situation as a whole is to be considered, ibid.; United States v. Thorson, supra, 282 F.2d at 164, and "degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required * * * are important for decision [under these statutes]." United States v. Silk, supra, 331 U.S. at 716, 67 S.Ct. at 1469, as quoted in Enochs v. Williams Packing & Navigation Co., supra, 370 U.S. at 3, 82 S.Ct. at 1127.

■ Applying the common-law test to the facts disclosed by the present record, it is clear that the captains and members of the crews of plaintiffs' vessels during the years in question were employees of plaintiffs. Crucial, of course, to this conclusion is the existence of a recognized right of control, and of an actual exercise of control, by plaintiffs over the conduct of the captains and crew members. Among the other factors persuasive of the existence of an employment relationship are: plaintiffs hired the captains, and had the right to fire them and to give them instructions of various kinds; the relation between plaintiffs and the captains and crew members was a reasonably permanent and continuing one; the captains and crew members recognized an obligation to follow instructions given by plaintiffs, and regarded themselves as employees of plaintiffs; the captains and crew members had no investment in the vessels or their equipment; plaintiffs carried all insurance on their vessels and crews, and through their insurance carrier paid all claims for injuries to fishermen aboard their vessels; plaintiffs ordered and paid for all repairs; plaintiffs paid all bills for food, fuel and other supplies and operating expenses; plaintiffs received payment for the catches from the buyers; plaintiffs paid the captains and crew members their shares of the proceeds, first withholding all applicable taxes; and plaintiffs handled all bookkeeping details in connection with the settlements. The "total situation", United States v. Silk, supra, 331 U.S. at 719, 67 S.Ct. at 1471, compels the conclusion that the relationship which the parties intended to, and did in fact, establish was an employment relationship within the meaning of the applicable statutes.

Since each case is to be governed by its own special facts, cases involving different factual situations provide little guidance. However, it is appropriate to point out that the relationship between plaintiffs and the captains and members of the crews of the fishing vessels involved in these actions was substantially identical to the relationships held to constitute employment relationships under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act in O'Hara Vessels, Inc. v. Hassett, 60 F.Supp. 672 (D.Mass.1942) and Cape Shore Fish Co. v. United States, No. 120-59, Ct.Cl., Jan. 24, 1963 (Commissioner's Opinion). It was materially different from the relationships held not to constitute employment relationships under the same statutes in Williams Packing & Navigation Co. v. Enochs, 176 F. Supp. 168 (S.D.Miss.1959), aff'd, 291 F. 2d 402 (5th Cir., 1961), rev'd on other grounds, and remanded with directions to dismiss the complaint, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), and Crawford Packing Co. v. United States, Civ. No. 2773, S.D.Tex., June 29, 1962, appeal pending.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of these actions and of the parties thereto

pursuant to the provisions of 28 U.S.C. § 1346(a) (1).

2. The captains and members of the crews of plaintiffs' fishing vessels during the years 1957 through 1960 were "employees" of plaintiffs within the meaning of Sections 3121(d) (2) and 3306(i) of the Internal Revenue Code of 1954, 26 U.S.C. §§ 3121(d) (2) and 3306(i), and the applicable regulations issued thereunder.

3. Plaintiffs are not entitled to recover of the defendant in these actions.