**ESSEX INSURANCE CO., Plaintiff,**

**v.**

**CARROLL ADVERTISING COMPANY, INC. and James F. Kane, Defendants.**

**No. CIV.A.01–11001–JLT.**

United States District Court, D. Massachusetts.

June 17, 2003.

Gabriel D.M. Ciociola, Robert L. Ciociola, Litchfield Cavo, Lynnfield, MA, for Essex Insurance Co., Plaintiff.

1. (Tr. at 107:15).

Brian J. Gunning, Dorchester, MA, for Carroll Advertising Company, Inc., Defendant.

Gabriel Thomas, Pauling Sugarman & Sugarman, P.C., Neil Sugarman, Sugarman & Sugarman, Boston, MA, for James F. Kane, Defendant.

### MEMORANDUM

TAURO, District Judge.

While hanging a billboard on June 4, 2000, James F. Kane inadvertently touched a high voltage electric line with a metal pole and was seriously injured. This case concerns the insurance coverage implications of that accident in which Kane was electrocuted and lost his left arm and lower leg.

At the time of the accident, Kane was working alongside his longtime friend, Jeffrey Ratigan, who allegedly did business in a joint venture with John Carroll as Carroll Outdoor Advertising, Inc. ["Outdoor"]. The billboard was owned by Carroll Advertising Company, Inc. ["Advertising"], a sign company owned solely by John Carroll, and covered by a one million dollars insurance policy issued by Essex Insurance Company ["Essex"]. Essex brought this action seeking a declaratory judgment that it could deny coverage for Kane's injuries, based on the theory that, as an employee of Advertising, Kane was excluded from the policy's coverage. Defendants claim that Kane was in fact an employee of Outdoor rather than Advertising, and thus falls under the policy's coverage.

The only question before the court is whether Kane was an "employee" of Advertising, as defined by the Essex insurance policy.

### FINDINGS OF FACT

Since 1995, John Carroll has owned Advertising,[1] a business that owns and rents

several billboards in the towns around Boston, Massachusetts.[2] Carroll and his wife are the only shareholders, officers, and directors of Advertising,[3] and Carroll is the sole employee.[4] Among the billboards owned by Advertising is the one in Plainville, Massachusetts, where Kane was injured.[5]

On November 14, 1999, Essex issued to Advertising a policy of commercial general liability insurance,[6] as required by one of Advertising's customers.[7] This one year policy, number 3CD7032, secured one million dollars of coverage and extended to eight billboards in towns around Boston, including the sign in Plainville.[8] The policy contained the following provision:

This insurance does not apply to any claim, suit, cost or expense arising out of 'bodily injury' to (1) any employee of a Named Insured arising out of and in the course of employment or while performing duties related to the conduct of the insured's business .... This exclusion applies whether an Insured may be liable as an employer or in any other capacity, and/or to any obligation to share damages with or repay someone else

who must pay damages because of injury, as well as liability assumed under any 'Insured Contract.' Wherever the word 'employee' appears above, it shall also mean any member, associate, leased worker, temporary worker or any person or persons loaned to or volunteering services to you.[9]

In April of 2000, Ratigan and Carroll began working together in the sign business in a joint venture called Carroll Outdoor Advertising.[10] Under the terms of an oral agreement between the two men, Ratigan expected to be a part owner and a director of Outdoor when it was incorporated.[11] Outdoor's revenue was derived from billboard installation fees,[12] income from two or three unspecified signs owned or leased by Advertising but dedicated to Outdoor,[13] and printing jobs.[14] Outdoor shared an office,[15] truck,[16] and telephone and fax lines with Advertising,[17] but had its own computer[18] and checking account.[19] Outdoor never had insurance,[20] an attorney,[21] or a reason to hire an accountant,[22] never filed a tax return,[23] and never issued a W–2, a 1099 tax form,[24] or a financial

2. (Tr. at 61:4–7; Ex. 4).
3. (Tr. at 107:18–19; 108:4–7).
4. (Tr. at 153:24—154:2).
5. (Tr. at 122:14–19).
6. (Ex. 4).
7. (Tr. at 154:6–10).
8. (Ex. 4).
9. (Ex. 4).
10. (Tr. at 58:8).
11. (Tr. at 59:11–13; 121:3–6; 121:8–15).
12. (Tr. at 66:23—67:15).
13. (Tr. at 79:6–13; 120:10–14; 121:3–6; 121:16–19; 123:4–6).
14. (Tr. at 121:3–6; 121:20–25).
15. (Tr. at 126:15–19).
16. (Tr. at 63:23—64:2).
17. (Id.).
18. (Tr. at 126:19–24).
19. (Tr. at 85:23–25; Exs. 1 & 2).
20. (Tr. at 64:24).
21. (Tr. at 99:25—100:2).
22. (Tr. at 100:3–9).
23. (Tr. at 100:10–13; 141:25—142:1).
24. (Tr. at 137:9–14).

statement.[25] Revenue from the billboards dedicated to Outdoor were deposited in the Outdoor checking account.[26] Ratigan wrote checks from and made deposits in this Outdoor account,[27] but never wrote checks on behalf of Advertising and lacked authority to do so.[28] Ratigan's only income during 2000 while he worked with Carroll came from Outdoor.[29]

Although Ratigan and Carroll began transacting business as Outdoor in April of 2000, Outdoor was not formally incorporated until October of that year[30] because of a communication breakdown between Carroll and his accountant.[31] Prior to this, Carroll understood Outdoor to be "a corporation that had not yet been incorporated."[32] On the advice of Carroll's accountant,[33] Carroll was listed as Outdoor's sole officer, director, and shareholder in its articles of organization.[34] Ratigan was aware of this state of affairs and did not object.[35]

Although at the time of the accident Kane was a full-time employee of a billboard company in New York,[36] he had discussed joining Outdoor with Carroll and Ratigan[37] and worked with Ratigan on several billboards.[38] Prior to the accident, Ratigan and Kane installed a sign in Braintree,[39] later discovered to be the sign intended for the Plainville billboard.[40] Ratigan paid Kane with a check for $690.00 drawn on the Outdoor account for his work installing four signs, including the one in Braintree.[41] The accident occurred while Kane and Ratigan were reinstalling the sign erroneously installed in Braintree.[42]

On June 4, 2000, Kane and Ratigan went to Plainville in a truck and with equipment owned by Advertising to mount the former Braintree sign.[43] Ratigan and Outdoor stood to receive no money for fixing the mistake, nor did they stand to suffer any immediate loss if the mistake were left unrepaired.[44] Although aware that neither he nor Outdoor would receive payment for remedying the prior installation mistake,[45] Ratigan told Kane that he would be compensated for his labor.[46] However, because the accident occurred, Kane was never paid.[47] While working under the direction of Ratigan,[48] Kane touched a high

25. (Tr. at 142:2–4)

26. (Tr. at 145:10—146:12).

27. (Tr. at 86:1–14; 137:15–20).

28. (Tr. at 86:17–22).

29. (Tr. at 83:13—84:4).

30. (Ex. 5).

31. (Tr. at 132:11–15).

32. (Tr. at 135:11).

33. (Tr. at 131:22—132:2).

34. (Tr. at 130:24—131:5; Ex. 5).

35. (Tr. at 132:3–10).

36. (Tr. at 198:2–5)

37. (Tr. at 147:11—148:1; 200:21–24).

38. (Tr. at 85:8–12)

39. (Tr. at 67:20–22).

40. (Tr. at 68:17–25; 140:12–25).

41. (Tr. at 87:4—89:12; 138:23—139:7; 156:8–12; 159:20–24; 199:2–5; Exs. 1 & 2).

42. (Tr. at 199:23—200:7).

43. (Tr. at 135:17—136:21; 137:2–3).

44. (Tr. at 92:23—93:10).

45. (Tr. at 92:23–24).

46. (Tr. at 71:24—72:5).

47. (Tr. at 200:8–17).

48. (Tr. at 91:1–4).

voltage electrical line with a metal pole and was electrocuted.[49]

On October 17, 2000, Kane filed a civil action against Advertising and others to recover for his injuries.[50] Essex employed claims adjustor Anthony Desjardins of Norfield Associates to investigate Advertising's coverage claim.[51] Desjardins questioned Carroll and Ratigan about Kane's relationship with Advertising,[52] but never asked any questions or reviewed any documents regarding Outdoor.[53]

### CONCLUSIONS OF LAW

 Under Massachusetts law, insurance contract interpretation is generally a matter of law for the court.[54] In the absence of ambiguity, these contracts are read according to their plain language.[55] As the Supreme Judicial Court has put it, the court "must construe the words of the policy according to the fair meaning of the language used, as applied to the subject matter."[56] Since in this case the fundamental question is whether Kane should be denied coverage under the policy as Advertising's "employee," it is important to note that exclusions in coverage are strictly construed against the insurer.[57]

As quoted in its entirety above, the Essex policy explicitly excludes from coverage injury to "any employee [of Advertising] arising out of and in the course of employment or while performing duties related to the conduct of [Advertising's] business." In making the contract, the parties agreed upon a definition of "employee" that included "any member, associate, leased worker, temporary worker[58] or any person or persons loaned to or volunteering services to [Advertising]." As the parties agree, the only policy terms that might possibly describe Kane and exclude him from Essex's coverage are "employee" or "volunteer."

Essex contends that Outdoor and Advertising are not distinct entities, and thus Kane must be either an "employee" or a "volunteer" of Advertising. Under Essex's theory, the dispositive issue is the independent corporate status of Outdoor, a question of fact.

 In support of its conclusion, Essex relies on the fact that the corporate papers formally establishing Outdoor's status were not finalized until after Kane's injury. Essex is clearly correct that Outdoor was not a de jure corporation at the time of the accident. But this circumstance is outweighed by the evidence demonstrating Outdoor's independence from Advertising. For instance, according to Carroll's undisputed and credible testimony, Outdoor owns a computer for which Advertising has no use, a substantial capital investment for such a small enterprise. Fur-

---

49. (Tr. at 136:22—137:1).

50. (Ex. 6).

51. (Tr. at 37:25—39:23).

52. (Tr. at 44:22—45:12; 46:20—47:1; 51:22—52:24).

53. (Tr. at 44:8–21; 50:19—51:21).

54. *Utica Mut. Ins. Co. v. Weathermark Inv., Inc.*, 292 F.3d 77, 80 (1st Cir.2002).

55. *Id.*

56. *Jacobs v. United States Fid. & Guar. Co.*, 417 Mass. 75, 627 N.E.2d 463, 464 (1994).

57. *Utica Mut. Ins. Co.*, 292 F.3d at 80.

58. The court notes an apparent internal contradiction in the policy's definition of "employee" to include temporary workers, insofar as the policy's later "Definition" section clearly states that " 'Employee' does *not* include a 'temporary worker.' " However, as neither party claims that Kane was a "temporary worker," this contradiction is irrelevant.

ther, nothing at trial called into question the evidence that Outdoor and Advertising maintained separate bank accounts. Outdoor's checking account was the only business account Ratigan had authority to access, and Kane was paid by a check drawn on it. Finally and most importantly, Essex produced no credible evidence at trial to contest Carroll and Ratigan's testimony that it was their intention and belief that Advertising and Outdoor were distinct corporations. That this testimony might ultimately serve both their own and Kane's financial interests is not by itself enough to discredit their sworn testimony, especially where corroborated by documentary evidence. Put simply, the fair weight of the evidence indicates that Outdoor and Advertising were not one and the same at the time of Kane's injury.

 Essex would have the court divide the universe of workers into the categories of employees and volunteers, but the law has long recognized subtler distinctions. Although all those working for a party's benefit without expectation of payment are volunteers, every worker who expects payment is not necessarily an employee. More than forty years ago the First Circuit noted the distinction in the common law between employees and independent contractors.[59] As the Supreme Court wrote more recently, the difference between an employee and an independent contractor primarily concerns the right of the hiring party to control the means by which the hired accomplishes the task:

> Among the factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the loca-

tion of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.[60]

Under this "multifactored test,"[61] Kane arguably was working as a common law independent contractor rather than as an employee. And although the Essex policy covers members, associates, leased and temporary workers, loaned persons, and volunteers, it does not mention independent contractors. The instant decision does not rest on this point, but it is enough to highlight that, under the common law to which Massachusetts ascribes, some subset of hired persons doing work for Advertising's benefit would not necessarily fall within the policy's definition of "employees."

The language of Essex's policy itself also prevents all workers from being simply divided into employees and volunteers. According to one of the general canons of contract construction, "[e]very word or phrase must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable."[62] Under the policy, it is not injuries to all employees that are excluded from coverage, but rather those injuries to

---

59. *United States v. Thorson*, 282 F.2d 157, 163 (1st Cir.1960).

60. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *accord Dykes v. DePuy, Inc.*, 140 F.3d 31, 37–38 (1st Cir.1998).

61. *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 630 (1st Cir.1996).

62. *Jacobs*, 627 N.E.2d at 464.

"any employee of [Advertising] arising out of and in the course of employment or while performing duties related to the conduct of [Advertising's] business." It would thus seem that the policy contemplates and extends coverage to anyone working for the benefit of Advertising so long as they are not an employee, member, associate, leased worker, temporary worker, person loaned to or volunteer to Advertising.

Kane's undisputed testimony was that he believed himself to be working for Outdoor, he was paid by Outdoor, and he worked alongside and at the direction of the principal of Outdoor. Under these facts, regardless of whether Kane was a common law employee of Outdoor or independent contractor, he certainly was not an employee of Advertising. Moreover, as one who was paid, and expected payment for his work, he was not volunteering services to either Advertising or Outdoor. Finally, Essex makes no claim that Kane was a member, associate, leased worker, temporary worker, or person loaned to Advertising. This court concludes, therefore, that Kane does not fall within the policy's definition of an "employee" of Advertising.

### CONCLUSION

This court finds that on June 4, 2000, James Kane was not acting as "Advertising's Employee" as defined by the Essex insurance policy, and therefore, is not excluded from coverage under that policy.

AN ORDER WILL ISSUE.