MILLARD'S Incorporated, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 695-53.

United States District Court
D. New Jersey.
Nov. 27, 1956.

**386**

Simon Bernstein, Newark, N. J., by Joseph J. Lyman, Washington, D. C., for plaintiff.

Chester A. Weidenburner, U. S. Atty., Linden, N. J., by Herman Scott, Asst. U. S. Atty., Newark, N. J., and Allen A. Bowden, Department of Justice, Washington, D. C., for defendant.

HARTSHORNE, District Judge.

This is an action for the recovery of Federal insurance contributions taxes for the taxable period June 30, 1948, through June 30, 1950, in an amount to be computed by the parties and incorporated in the judgment to be filed herein.

The taxes in question are taxes paid to the United States on the earnings of certain workers called "applicators" under the Federal Insurance Contributions Act, 26 U.S.C.A. (I.R.C.1939) § 1400 et seq.

Testimony relating to this claim was heard by the Court sitting without a jury on October 1, 1956.

Findings of Fact

1. The plaintiff is a corporation, organized under the laws of the State of New Jersey and during the period in issue did business in the State of New Jersey.

2. The plaintiff corporation was engaged in the business of applying roofing and siding to the roofs and sidewalls of houses and buildings in need of repair.

3. Contracts for the performance of this work were solicited by salesmen from owners of property. These contracts were in writing and provided a unit price for the materials and labor necessary to perform the repair and improvement which was described in general terms.

4. The salesmen referred to were determined by the defendant administratively to have been independent contractors. The taxes with reference to their earnings are not in issue.

5. The applicators were persons who performed the labor of affixing the roofing and siding materials to the roofs and sidewalls of the structures described in the contract with the customer.

6. The applicators involved were men long experienced in the work involved.

7. When a job was ready, the applicators would come to plaintiff's office and were handed a work sheet which contained the name and address of the customer where the work was to be performed and a general statement of the nature of the work to be done. Few measurements were on the worksheet, but the applicators were advised as to the approximate number of squares (100 square feet) of material to be applied.

8. No writing was executed between the applicators and the plaintiff concern-

ing their arrangement. With the exception of the worksheet, the arrangement between them was entirely oral.

9. The parties understood that payment was to be made by plaintiff upon a unit price for each square of material applied, and that compensation would be paid upon satisfactory completion of the job. In the meantime, the applicators could draw a partial payment each week for the work done on the job still to be finished. This payment was based on their own statement as to how many squares they had applied during the week. If the job called for 10 squares and only 8 were applied, the applicator would be compensated for 10 squares. No time was agreed upon or discussed within which the applicators would start or complete the work.

10. Certain jobs requiring carpentry work, which could not be compensated on a per square basis were made the subject of negotiation between the applicators and the plaintiff and a price for such work was then agreed upon in addition to the work compensated on a per square basis.

11. The applicators furnished their own transportation to and from the place of performance. They furnished their own tools which consisted of an ordinary kit of carpenter's tools, such as hammer, saw, knife, shears, level and crowbar. The plaintiff furnished the ladders and planks to make the staging.

12. The applicators determined their own hours of work and were free to hire their own helpers whom they would pay by instructing the plaintiff what part of the compensation for the whole job should be allotted to the helper.

13. The applicators received no instruction or direction from plaintiff as to where or in what manner the work should be started or the method to be used in applying the materials.

14. The jobs were inspected on occasions during their progress by Mr. Furman, the president of the corporation, whose knowledge of the techniques of applying the materials was limited. The plaintiff had no supervisors or other personnel who watched the applicators as the work progressed to instruct or direct them how the jobs should be done. The plaintiff was primarily concerned with the results, which should conform to the contract, rather than the manner or method by which the results were accomplished.

15. The plaintiff depended upon the fact that the applicators were men of experience and upon a satisfactory completion of the job before final payment was made to assure that the work was properly performed. When results did not conform to workmanlike standards, it had to be corrected without additional compensation for the defective work, regardless of the time involved.

16. The arrangement between the applicators and plaintiff was such that an applicator could and did reject a job without a sanction being imposed by the plaintiff. After completing a job from a worksheet, the applicators were free to apply for another from the plaintiff, to take no work at all, or seek a job from another company engaged in a like business.

17. There was nothing in the arrangement between the plaintiff and the applicators which would hinder or prevent the applicators from working on their own account or for other companies doing similar work between periods of working for the plaintiff.

18. The applicators performed the work under conditions where each job was considered a separate and distinct undertaking and a separate work-sheet was furnished the applicators each time they undertook the same.

### Discussion

The fact that "plaintiff was primarily concerned with the results which should conform to the contract rather than the manner or method by which the results were accomplished" is the crucial point. For, after the earlier conflicting decisions of the lower Federal Courts, after the decisions by the United States Supreme Court of U. S. v. Silk (Harri-

son v. Greyvan Lines, Inc., 1947, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757, and Bartels v. Birmingham, 1747, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947, and after the adoption of the Gearhart Resolution upon the basis of the Senate Report, it must be considered settled law "that the usual common law rules, realistically applied, must be used to determine whether a person is an 'employee' for purposes of applying the Social Security Act * * *". That is that "such relationship (of employer and employee) exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer, not only as to what shall be done but how it shall be done * * *." 2 U.S.Code Congressional Service, 80th Congress, 2d Session 1948, page 1752, S.R. 1255, H.R. 1319. Moreover, the Act is not to be understood, as it often previously had been understood, to define an "employee" as "an individual in a service relationship, who is dependent as a matter of economic reality upon the business to which he renders service, and not upon his own business as an independent contractor." This latter has now been definitely discredited by the Congress itself, as not being the intent of the Act.

There is evidence in this case indicating that normally these applicators did not engage in work for others (though they might perchance have done so legally), while they were working for Millard's; there is evidence that Millard carried its sign on these jobs; that its superintendent was generally spoken of as "the boss"; that the applicators ordinarily referred third parties, looking for roofing work, to Millard's. But all this and more, goes primarily to the question of whether the applicators were "dependent as a matter of economic reality upon the business" of Millard. All this is therefore largely beside the point, so far as this case is concerned.

The real point is, whether Millard did have the right of control "not only as to the result to be accomplished by the work, but also as to the details and means by which that result is accomplished." As to this, as seen above, it is the definite testimony of Millard's own president and superintendent that what he was interested in was "the complete job." In full corroboration of this, we have from the lips of the applicators testimony that, while this superintendent might at times make suggestions as to how certain work should be done, if the applicators did not like this suggestion they simply did not follow it. Again, in an entirely different connection, the applicators testified that, if the Millard superintendent wanted them to do some particular thing in the course of their work, they would of course comply, provided there was no technical reason to the contrary. But this clearly infers that, if the applicators felt there was a technical reason to the contrary, they would not do what Millard's superintendent wanted them to do, as to these very details and means. In short, Millard had the right to control the result, but not "the details and means by which that result is accomplished."

█ In the light of this conclusive testimony on the crucial issue, this Court is compelled to conclude that under the terms of the Federal Insurance Contributions Act, as so forcefully defined by the Congress itself, the applicators in question are not mere "employees". See accord: Seal-Tite Roofing & Siding Co., Inc., v. United States of America, D.C. N.J.1956, Madden, J., not reported.

### Conclusions of Law

1. This Court has jurisdiction of the parties and of this action, 28 U.S.C.A. § 1340.

2. The applicators in question were independent contractors and not employees within the meaning of Section 1426(d), Title 26, United States Code.

3. The plaintiff is entitled to recover the taxes paid by reason of the erroneous payment and collection thereof.

4. Judgment should be entered in favor of the plaintiff in this action, the amount thereof to be computed by the parties, as stipulated.