Leo and Celia MERVIS d/b/a Housecraft Southern Siding Co., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 8166.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 15, 1960.

Polack & Rosenberg, Samuel I. Rosenberg, New Orleans, La., Joseph J. Lyman, Washington, D. C., for plaintiff.

Bernard J. Schoenberg, Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

J. SKELLY WRIGHT, District Judge.

The above entitled civil action having come on for trial before the court sitting without a jury, and due consideration having been given to the pleadings, stipulations of fact and exhibits, testimony and briefs on file, the court enters the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.

### Findings of Fact.

1. This is an action arising under the internal revenue laws of the United States for recovery of taxes paid pursuant to the Federal Unemployment Tax Act, 26 U.S.C. § 3301 et seq. for the calendar year 1956.

2. The plaintiffs were partners, doing business under the trade name Housecraft Southern Siding Co., in and around New Orleans, Louisiana, during the calendar year 1956.

3. The plaintiffs were engaged in the installation of roofing and siding materials. These products were sold to and installed on the premises of property owners.

4. Contracts for the performance of this work were solicited by salesmen from property owners. These contracts were in writing and specified an all-inclusive price for materials and labor.

5. After a contract was brought to plaintiffs' office by a salesman, it was processed to determine the customer's credit. Then the plaintiffs' expediter, a salaried employee, would assign the job to an applicator.

6. The applicators were the persons who performed the labor of affixing the roofing and siding materials to existing homes and buildings.

7. Plaintiffs had a list of applicators who had performed work for them over the years.

8. Sometimes applicators would come to plaintiffs' office seeking work and occasionally plaintiffs would advertise in the classified sections of local newspapers for experienced applicators.

9. The applicators were usually men long experienced in the work involved.

10. When a job was ready, the applicator would come to plaintiffs' office to discuss it or was called by telephone and advised of the name and address of the customer and the nature and extent of the work to be performed on the site.

11. No writing was executed between the applicators and the plaintiffs concerning their arrangement, the relationship being entirely oral.

12. The applicator would visit the job site and determine whether he would undertake it. He was not required to accept all jobs offered him and, in practice, sometimes refused jobs offered. After such refusal he would be offered another job if one was available.

13. There was no agreement as to how long a specific job should take and an applicator could determine his own work hours.

14. The plaintiffs furnished the materials to be applied and transported them to the job site.

15. The applicators furnished all the tools and equipment necessary for the performance of the work. They also provided their own trucks for transportation of themselves, their tools and their equipment to and from the various job sites. The applicators paid all expenses incident to the performance of the work, including the upkeep and maintenance of their equipment and trucks, without reimbursement from the plaintiffs.

16. In the typical roofing or siding job the applicator was compensated on a per square basis, i. e., a fixed amount per 100 square feet of material applied.

17. Each job was a separate and distinct undertaking between the plaintiffs and the applicator who was compensated by the job and not upon an hourly, daily or weekly basis. Payment was made at the completion of a job and not on any particular day. On longer jobs, an applicator could draw against the whole job on the basis of the number of squares applied or to the extent of work completed.

18. Some application jobs required some carpenter work because of the "cut-up" nature of the surfaces where pipes or meters and the like might extrude from the building. The cutting and fitting of materials or the replacement of weatherboards was considered extra work. When an applicator asked for additional money the amount was usually negotiated between him and the plaintiffs. Such amounts were in addition to the per unit piece-work rates.

19. Higher rates per unit were paid for jobs on buildings above the first story and for those some distance outside the city limits. The rates also varied with the kinds of materials applied.

20. In many instances signs would be put up at jobs stating the work was being done by Housecraft. If a person approached the applicator on the job about having similar work done, he was referred to Housecraft. However, there was testimony that the applicators were not compelled to refer the inquiry, but did so as a matter of good business practice.

21. Plaintiffs' work expediter, a regular salaried employee, in addition to giving out the work orders to the applicators, would usually negotiate prices for extra work with the applicators and bring to their attention faulty work or customers' complaints. If work was not done according to the contract, the plaintiffs required that it be corrected. Applicators were required, for no additional compensation, to rectify faulty work brought to their attention.

22. The plaintiffs' expediter rarely visited jobs in progress, except where customers' complaints arose. His function primarily was to supervise the office paper work relative to the jobs and to see that the completed jobs conformed with the plaintiffs' contracts with the customers.

23. The plaintiffs gave no directions or instructions to the installers, other than the information given when the job was assigned, concerning the manner or method of accomplishing the work. The plaintiffs relied upon the experience and qualifications of the applicators to assure satisfactorily completed work.

24. There was no agreement express or implied spelling out the extent to which the plaintiff would retain control of the work.

25. Some applicators worked alone. Others had an associate applicator of their choice. The compensation paid for the job was divided between the applicators in accordance with the agreement between them, and the plaintiffs did not participate in such arrangements. The applicators were free to and did hire helpers without any interference by the plaintiffs. The applicators determined the helpers' pay, hours and working conditions. The helpers were usually paid directly by the applicators, although sometimes they received their pay from the plaintiffs in an amount specified by the applicator out of the whole amount due from plaintiffs to the applicator for the specific job on which the helpers were engaged.

26. If any unusual circumstance arose, making the job more difficult and hence costly, the applicator would consult with the plaintiffs before proceeding. However, they would do minor work, such as installing shelves or fixing steps in a house, and be paid directly by the customer without consulting plaintiffs.

27. Upon completion of a job the applicator caused the customer to sign a

completion certificate which, when delivered to the plaintiffs, entitled the applicator to immediate payment for the entire job.

28. If an applicator did unsatisfactory work, or was otherwise objectionable, the plaintiffs would not offer him another job. An applicator could terminate his relations with the plaintiffs simply by not requesting or accepting another job assignment. Each job was a separate and complete undertaking.

29. Plaintiffs would terminate an applicator's work on a job if it appeared that the work was not being performed in accordance with the contract. Such conduct was considered a breach of the subcontract with the applicator.

30. Ordinarily when an applicator finished a job he called or returned to plaintiffs' office for another one. However, he was not required to do so. The applicators could and at times did work for competitors of the plaintiffs and would thereafter return and perform services for the plaintiffs. An applicator made no agreement to work regularly for plaintiffs, nor did plaintiffs agree to give him additional jobs for any specific period of time. About seventy applicators performed services for plaintiffs during the year in question. About five or ten were considered "regulars."

31. Plaintiffs had certain full time salaried employees other than applicators. Their status is not here in issue.

Conclusions of Law.

1. This court has jurisdiction of the parties and this action pursuant to the provisions of 28 U.S.C. § 1340.

2. The applicators in question here were not employees within the meaning of 26 U.S.C. § 3306(i), Internal Revenue Code of 1954, § 3306(i). See United States v. Thorson, 1 Cir., 282 F.2d 157, affirming Thor Company v. United States, D.C.D.Mass., 173 F.Supp. 65; American Homes of New England, Inc. v. United States, D.C.D.Mass., 173 F.Supp. 857; Edwards v. United States, Ct.Cl., 168 F.Supp. 955; Jagolinzer v. United States, D.C.D.R.I., 150 F.Supp.

489; Farm & Home Modernization Corp. v. United States, D.C.N.D.N.Y., 138 F.Supp. 423; Silver v. United States, D.C. N.D.N.Y., 131 F.Supp. 209; Metropolitan Roofing and Modern. Co. v. United States, D.C.D.Mass., 125 F.Supp. 670. Compare, Security Roofing & Construction Co. v. United States, D.C.D.Mass., 163 F.Supp. 794; Ben v. United States, D.C.N.D. N.Y., 139 F.Supp. 888, affirmed 2 Cir., 241 F.2d 127.

3. The plaintiffs are entitled to refund of the FUTA taxes paid by them for the year 1956 on the earnings of these applicators.

4. Judgment will be entered for the plaintiffs in the amount of $345.16 with interest.