353 F.2d 216
 ILLINOIS TRI-SEAL PRODUCTS, INC.
v.
The UNITED STATES.
John D. BUCHANAN, Howard Brown and Edward Marcus, d/b/a Tri-Seal Installation Co.
v.
The UNITED STATES.
John D. BUCHANAN and Frank Commiso d/b/a Tri-State Installation Co.
v.
The UNITED STATES.
 Nos. 429-61 - 431-61.
 United States Court of Claims.
 November 12, 1965.
 
 Joseph J. Lyman, Washington, D. C., for plaintiff.
 Philip R. Miller, Washington, D. C., with whom was Acting Asst. Atty. Gen. Richard M. Roberts, for defendant. C. Moxley Featherston, Lyle M. Turner, and Mitchell Samuelson, Washington, D. C., of counsel.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.
 PER CURIAM.
 
 
 1
 These related cases — testing whether certain "installers" were plaintiffs' employees for the purposes of the Federal Insurance Contributions Act and the Federal Unemployment Tax Act — were referred pursuant to former Rule 45(a) (now Rule 57(a)) to Trial Commissioner Herbert N. Maletz, with directions to make findings of fact and recommendations for a conclusion of law. The commissioner has done so in an opinion and report filed on April 29, 1964. He has concluded that these installers were not the taxpayers' employees under the two taxing statutes, that the plaintiffs are entitled to recover the taxes assessed against and paid by them, and that defendant's counterclaims for unpaid taxes must be rejected. The defendant accepts the trial commissioner's findings (with one exception) but urges that his legal conclusions are erroneous. The plaintiffs ask the court to adopt the commissioner's findings and his conclusions. The parties have filed briefs and the cases have been argued orally.
 
 
 2
 The court agrees with Commissioner Maletz's findings, opinion (with a slight modification), and recommended conclusions of law. Without minimizing the other factors and circumstances discussed by the commissioner, the court lays particular stress in these cases on the fact that the installers themselves considered that they had their own business and were self-employed (finding 52), as well as on the correlative fact that they themselves paid self-employment taxes based on the sums paid them by plaintiffs, but that plaintiffs did not assume any liability for employment taxes (findings 54, 56). In close cases, such as these, the view of their own relationship which is taken and acted upon by the parties — particularly with respect to the payment of employment taxes — is very significant. See Restatement of the Law, Agency 2d, § 220, pp. 486, 492.
 
 
 3
 The court adopts the trial commissioner's findings and his opinion (with a slight change), as supplemented by this opinion, as the basis for its judgment. Plaintiffs are entitled to recover and judgment is entered to that effect. The amount of recovery will be determined under Rule 47(c). The defendant is not entitled to recover on its counterclaims which are dismissed.
 
 
 4
 The opinion of Commissioner Maletz, with a small modification by the court, is as follows:
 
 
 5
 The Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA) impose a tax on every employer with respect to individuals in his employ based on the wages paid. Section 3121(d) (2) of the Internal Revenue Code of 1954 defines an "employee" under FICA as "any individual who under the usual common law rules applicable in determining the employer-employee relationship has the status of an employee." A similar definition is contained in section 3306(i) dealing with FUTA.[1]
 
 
 6
 In 1961 the Government assessed deficiencies, penalties and interest against plaintiffs in these three actions for FICA, FUTA and withholding taxes. Such assessments were computed on the earnings of persons known as "installers" who performed services for plaintiffs by installing aluminum storm doors and windows in homes and buildings of plaintiffs' customers. The Commissioner of Internal Revenue determined that the installers were employees of the plaintiffs for Federal Tax purposes and that plaintiffs should, therefore, have withheld income taxes from their earnings and contributed and paid FICA and FUTA taxes thereon. In each case, $200 of the deficiency assessment was paid and suit brought here for recovery. The Government, in turn, has filed counterclaims totaling $202,149.18 for the unpaid deficiencies. The three cases have been consolidated and present a single issue: whether the installers were, during the period from January 1, 1954 through March 31, 1958, employees of plaintiffs within the meaning of sections 3121(d) (2), 3306(i) and 3401(c) of the Code.
 
 
 7
 Plaintiff Illinois Tri-Seal Products, Inc. (Illinois Tri-Seal) was engaged in the manufacture and sale of aluminum storm doors and windows. Its salesmen (who were independent contractors) would obtain written contracts from home owners under which the company agreed to sell and to install the doors and windows in the customers' homes. Installation of Illinois Tri-Seal's products was handled initially through the plaintiff-partnership known as Tri-Seal Installation Co., and later through the plaintiff-partnership known as Tri-State Installation Co. Also during part of the period installation was handled directly by Illinois Tri-Seal.
 
 
 8
 After a sales contract was entered into between Illinois Tri-Seal and a customer, the company's measuring man (a regular salaried worker) went to the customer's home to measure the size of the doors and windows: he then filled out a work sheet setting forth the name and address of the customer; the number, location and measurement of the windows and/or doors to be installed; and in some instances the promised completion date. When the installation was a normal one, no special instructions were generally set forth in the work sheet; special instructions were, however, included in the work sheet when extra or carpentry work was required. From the information contained in the work sheet, the doors and windows were manufactured by Illinois Tri-Seal; thereafter plaintiffs' "expediter" gave the work sheet to an installer who affixed the doors and windows to the home of Illinois Tri-Seal's customer in accordance with the specifications contained in the work sheet.[2]
 
 
 9
 Installers did not maintain an office, nor did they advertise in the newspapers or the yellow pages of the telephone directory. Some however, had their own business cards. Installers would come to plaintiffs' office looking for installation work which they usually learned about through word of mouth. On occasion, if work was not available, they were told to come back at a certain time. Plaintiffs also maintained a list of installers who had performed work for them in the past and from time to time called them to advise that work was available. Plaintiffs dealt only with long-experienced installers and relied on their experience for satisfactory work, all of which was performed away from plaintiffs' premises. There was no written contract between the installers and plaintiffs concerning their arrangement. With the exception of the work sheet, the arrangement was entirely oral.
 
 
 10
 The installers furnished their own tools and equipment which generally had a value of $200-$300 and consisted mainly of carpentry items such as hammers, screw drivers, hacksaws, power tools, caulking guns and ladders. The installers also provided their own trucks for transportation of their tools and equipment to and from the various job sites, and they paid all the expenses for the upkeep and maintenance of their equipment and trucks.
 
 
 11
 Plaintiffs furnished the windows, doors and other materials to be installed. The installers picked these up at plaintiffs' plant, loaded them in their own trucks and delivered them to the job sites. Some installers stored doors and windows for assigned jobs at their own expense until they could arrange with the customer to do the work. In the event lumber and other materials required for the installation were not available in plaintiffs' shop, the installers themselves, in their own discretion, purchased these materials and were later reimbursed by plaintiffs. If an installer broke a window in the process of installing it, plaintiffs replaced it without charge to the installer.
 
 
 12
 The installers had no specified working hours; rather, each determined for himself his own hours, the length of time he would work, and the amount of time that he would take off. The installers hired their own helpers and determined their pay, hours and working conditions. On occasion, when an installer had an extra large window he could not handle alone, he, in his own discretion, hired someone in the area to assist him and was later reimbursed by the plaintiffs for the additional expenditure. Alternatively in such a situation, he would request plaintiffs to send one of their employees to assist him; however, in no instance was he required to accept any of plaintiffs' employees as a helper. From time to time, installers joined together in doing a job and usually one check for the work would be issued by plaintiffs with the installers deciding among themselves how the proceeds were to be divided. In some instances, plaintiffs paid each of such installers individually according to the division the installers had agreed upon.
 
 
 13
 As a general rule an installer's compensation was based on a piecework rate for each door or window that was installed. On occasion an installation job under plaintiffs' contract with the customer required extra work and in that event the installer was paid a flat rate therefor based on a table established by plaintiffs covering common items of extra work. If, however, the nature of the extra work was such that it was not covered by the table, plaintiffs and the installer generally negotiated a flat rate for doing it, though in exceptional instances, particularly where the time required for the extra work could not be determined, the installer would specify an hourly rate therefor. Where the job site was beyond a 40-mile radius, the installer received additional compensation from plaintiffs for mileage on the basis of a fixed amount per unit installed. In the event the installer went to a customer's home to perform the work only to find that the customer had canceled his contract with plaintiffs, he received compensation from plaintiffs for "lost time" in an amount agreed to by the parties.
 
 
 14
 On various occasions plaintiffs were asked by their customers to enclose porches in their homes and in such instances plaintiffs would request the installers to submit bids or estimates for doing the work.
 
 
 15
 Under the arrangement an installer was not required to accept all jobs that were made available to him by plaintiffs' expediter, and there were occasions when an installer rejected a proffered job. Despite rejection of a job, an installer was given other installation work by plaintiffs.
 
 
 16
 Generally when an installer completed one or more jobs for the plaintiffs, he returned to plaintiffs' office for further work sheets if they were available and this usually occurred once or twice a week. The installers were free to accept and perform similar work for competitors of plaintiffs and would, after having done such work, return to plaintiffs' office and be given work sheets by plaintiffs. Some installers performed services for competitors of plaintiffs on the same day they installed plaintiffs' products, and it was a common occurrence for an installer to have in his truck at the same time not only plaintiffs' doors and windows but those of another company as well.
 
 
 17
 There was no understanding that the installers would work regularly for the plaintiffs, nor did the plaintiffs agree to give the installers additional jobs for any specific time. Instead, all installation work was on a job-to-job basis. The work was seasonal and at the peak periods plaintiffs had as many as 20 or 21 installers performing services; at other times there were as few as 3 or 4. There were about 3 or 4 "regulars" who could be looked to by plaintiffs in assigning work sheets throughout the year, but none of these "regulars" guaranteed or promised that he would do a certain number of jobs for plaintiffs. Nor did plaintiffs promise any "regular" that he would get any work or that he would get continuous work. In actual practice, however, the "regulars" spent a major portion of their time in doing installation work for plaintiffs. In the intervals between doing installation jobs for plaintiffs, the "regulars" did similar work for other companies which took from 10%-25% of their time. When a "regular" was performing work for another company and was told by plaintiffs that a job was available, he would not drop what he was doing but would rather inform plaintiffs that he would get to their work as soon as he could. When the plaintiff-partnership Tri-State Installation Co. was set up to handle the installation work for Illinois Tri-Seal, all installers who had previously been performing work for Illinois Tri-Seal accepted a partner's invitation to perform installation jobs for the partnership; they also attended occasional meetings called by a partner to discuss various problems.
 
 
 18
 It was the practice for the installer to communicate directly with plaintiffs' customer to arrange for a mutually convenient time to do the work. The installer determined the order in which the jobs should be done and routed his work sheets on a geographic basis in order to avoid unnecessary travel between jobs. In the event a work sheet indicated a customer's preference as to when the work should be done, the installer tried to comply as best he could. On a few occasions, because of the location of job sites, an installer would swap work sheets with another installer.
 
 
 19
 In some instances, a customer of plaintiffs would indicate that he would cancel the contract unless an installation job was completed within a short time. This was referred to as a "hot job" and the installer to whom the work sheet was assigned was requested by plaintiffs to give it priority. If the installer advised plaintiffs that he could not fit the job into his schedule, plaintiffs would ask another installer to do the work.
 
 
 20
 Occasionally a prospective customer approached an installer while he was on a job for plaintiffs to inquire about purchasing storm windows. The installer tried to interest him in the plaintiffs' product and if he were interested, the installer turned the lead in to plaintiffs and received a bonus in the event a sale were made. On the other hand, if the prospective customer was not interested in plaintiffs' product, the installer was free under his arrangement with plaintiffs either to sell him windows on his own account or to turn the lead into another company. Where the installer sold the windows on his own account, he would purchase the windows himself, perform the installation work and be paid directly by the customer.
 
 
 21
 While performing an installation job for plaintiffs, a customer would from time to time request extra work not called for by the contract. When this involved minor work, the installer did this on his own without notifying the plaintiffs and would be paid directly by the customer. Otherwise the installer notified the plaintiffs and a further contract was arranged between the plaintiffs and the customer and a work sheet was issued for the installer for this additional work.
 
 
 22
 Plaintiffs had no foremen or supervisors who directed the manner of doing the work and there was no express agreement spelling out the extent to which the plaintiffs had control over the work. If upon completion of the job the installer's work were found to be faulty, plaintiffs' expediter ordered it to be corrected and the installer was expected to correct it without additional compensation. However, if the installer was not available, the plaintiffs would have the work repaired by one of their regular salaried servicemen employed by plaintiffs for that purpose.
 
 
 23
 Since the installers were experienced, they did not need detailed instructions about how to do the jobs. Special instructions and problems were noted on the work sheets and also brought to the attention of the installers by plaintiffs' expediter. The installers were expected to follow such instructions so that the job would be accomplished in accordance with the specifications contained therein. Plaintiffs' expediter did not visit jobs in progress except in rare instances, as, for example, when the installer requested more money for doing a job or a misunderstanding arose with a customer as to the scope of the contract. Plaintiffs' expediter had the responsibility of seeing to it that the completed job conformed with plaintiffs' contract with the customer.
 
 
 24
 Other than the information contained in the work sheet, plaintiffs gave no directions or instructions concerning the manner or method of accomplishing the work. In the event an installer encountered an unusual problem on the job, he generally called plaintiffs' expediter and asked for suggestions which he was free to follow or not, as he saw fit. Thus, if an installer considered that the expediter's suggestion was unsatisfactory, he did not follow it but used his own discretion in solving the problem.
 
 
 25
 During the period involved no installer was discharged while the work was in progress. If an installer did unsatisfactory work, the plaintiffs would refuse to offer him further work sheets. Installers could terminate their relationship with plaintiffs by not requesting or accepting further work sheets. Some of the installers believed plaintiffs could terminate their work before completion but in such event would be obligated to pay the installer for the full amount of the job as shown on the work sheet.
 
 
 26
 Under the arrangement it was understood that the installer would do the job in a workmanlike manner and that he would clean up the work-site after the job was completed. A completed job was indicated by the installer's signature on the work sheet, or by a completion certificate signed by the customer indicating that he was satisfied with the work and the material. When a completion certificate was secured, the installer was paid a bonus by plaintiffs.
 
 
 27
 Installers were usually paid on Friday for work completed in the week but they could and did draw advances on work completed. Installers never drew the same amount on succeeding Fridays; instead, their earnings varied according to the volume of work or their own availability.
 
 
 28
 During the period in question, plaintiffs entered into an agreement with Blue Cross-Blue Shield to provide group insurance coverage for plaintiffs' "employees". Plaintiffs gave the installers opportunity to enroll in the plan and the premiums therefor were withheld from the compensation due those of the installers who elected to enroll. To be eligible to enroll in the plan one was not required to be an "employee" under the common-law test of master and servant; it was only necessary that the enrollee have some "rapport" with plaintiffs and that there be a common mechanism for collecting and forwarding the premiums to Blue Cross-Blue Shield. Thus, plaintiffs' salesmen, who were concededly independent contractors, were likewise eligible for enrollment.
 
 
 29
 The installers considered they had their own business and that they were self-employed. They were not members of a labor union and dealt with plaintiffs on an individual basis. Plaintiffs carried no workmen's compensation policy covering the installers nor did plaintiffs pay State unemployment insurance on the earnings of installers. Installers carried their own personal and property liability insurance while performing services for plaintiffs and were required to deposit with plaintiffs a certificate showing they had such insurance coverage before being given any installation job. In addition, plaintiff Tri-State Installation Co. carried a general contractor's liability policy.
 
 
 30
 The installers paid self-employment and income taxes based upon earnings reported by plaintiffs on Forms 1099. Plaintiffs did not withhold taxes or assume liability for employment taxes on the earnings of installers. All installers were issued copies of Form 1099 at the end of each year disclosing the entire amount of compensation paid for the taxable year.
 
 
 31
 The problem here is to determine, on the basis of the above facts, whether or not the installers were employees within the meaning of sections 3121(d) (2) and 3306(i) of the 1954 Code, both of which "specifically adopt the common-law test for ascertaining the existence of the employer-employee relationship." Enochs v. Williams Packing & Nav. Co., 370 U.S. 1, 3, 82 S.Ct. 1125, 1127, 8 L.Ed.2d 292 (1962). It is, of course, fundamental that under the common-law test, the relationship of employer and employee exists where the principal has the right to direct the manner and method in which the work shall be done, as well as the result to be accomplished, while an independent contractor relationship exists where the individual who performs work for another does so according to his own manner and method, free from direction or right of direction in matters relating to the performance of the work save as to the result. New Orleans, M. & C. Railroad Co. v. Hanning, 15 Wall. 649, 656, 21 L.Ed. 220 (1872); Singer Mfg. Co. v. Rahn, 132 U.S. 518, 523, 10 S.Ct. 175, 33 L.Ed. 440 (1889); Jones v. Goodson, 121 F.2d 176, 179 (10th Cir., 1941). Thus the applicable Treasury Regulations under FICA (1954 Code) — which are an authoritative elaboration of the distinction under the common-law test between an "employee" and an "independent contractor"[3] — provide in part:
 
 
 32
 § 31.3121(d)-1. Who Are Employees.
 
 
 33
 (a) * * *
 
 
 34
 (c) Common Law Employees. (1) Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.
 
 
 35
 (2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees. * * *
 
 
 36
 (3) Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be determined upon an examination of the particular facts of each case.[4]
 
 
 37
 Defendant contends, however, that the common-law rules for determining the relationship must be realistically applied and that this requires use of the so-called "economic reality test" under which a person is considered to be an employee if he is dependent upon the business for which he renders service. Consideration of this contention makes necessary an examination of the legislative history of the statutes in question.
 
 
 38
 When the Social Security Act was originally adopted in 1935, it set forth no definition of the term "employee"; section 1106(a) (6) merely specified that it "includes an officer of a corporation."[5] Soon afterward, though, the Treasury Department promulgated regulations (which were substantially the same as the present regulations) interpreting the statutory term "employee" on the basis of the common-law control test.[6] The Federal courts, however, applied varying standards in determining who were employees: A majority held that the term was to be given its common-law meaning;[7] a few ignored the common-law test and looked instead to the purpose of the legislation for guidance;[8] and still others looked to both the purpose of the legislation and the common-law rules for guidance.[9] See generally Broden, Employment Relations Under Social Security, 33 Temple L.Q. 307, 312-316 (1960). It was in this setting that the Supreme Court in 1947 handed down two opinions in United States v. Silk and Harrison v. Greyvan Lines, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947). In Silk and Greyvan taxpayers sued to recover unemployment taxes contending that the persons for whose benefit the taxes were paid were independent contractors, not employees. In Silk the status of two groups — coal unloaders and coal truck drivers — was in question, while in Greyvan the dispute involved the status of moving van drivers. The Court upheld the Commissioner's determination that the unloaders were employees, but concluded that the truck and moving van drivers were independent contractors. As to the coal unloaders the Court noted that they provided only picks and shovels; they had no opportunity to gain or lose except from the work of their hands and these simple tools; that while they did not work regularly, they worked in the course of the employer's trade or business and this brought them under the coverage of the Act as being within the group the legislation was intended to aid. The taxpayer, the Court observed, "was in a position to exercise all necessary supervision over their simple tasks. Unloaders have often been held to be employees in tort cases." (331 U.S. at 718, 67 S.Ct. at 1470.)
 
 
 39
 As to the truck and moving van drivers, the Court agreed with the decisions below that where the arrangements left the driver-owners so much responsibility for investment and management, they must be held to be independent contractors. The Court pointed out that the driver-owners were small businessmen; they owned their own trucks; they hired their own helpers; and though in one instance they hauled for a single business and in the other for any customer, such distinction, though important, was not controlling: it was the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marked the driver-owners as independent contractors.
 
 
 40
 While these holdings were obviously consistent with established common-law principles of control, the Court also made it plain that the control test should be a factor — but not the sole criterion — in the determination of the employment relationship. Rather, the Court declared that the term "employee" should be construed to accomplish the purpose of the social security legislation and that a constricted interpretation would not comport with such purpose. A week later in Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947),[10] the Court reiterated that the test of the relationship was not to be ascertained solely by the control factor: in the application of social legislation (the Court said) employees included those who as a matter of economic reality were dependent upon the business to which they rendered service.
 
 
 41
 As a consequence of these decisions, the Treasury Department in November 1947 proposed a new regulation defining the employer-employee relationship on the basis of the economic reality test.[11] The proposed regulation caused considerable criticism in Congress and led to enactment in June 1948 of H.J.Res. 296 (62 Stat. 438) over President Truman's veto.[12] That resolution (known as the Gearhart resolution "to maintain the status quo in respect of certain employment taxes and social security benefits pending action by Congress on extended social security coverage") amended sections 1426(d) and 1607(i) of the 1939 Code to provide that the term "employee" —
 
 
 42
 does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules.
 
 
 43
 The legislative history of the Gearhart resolution makes it clear that the Congressional intent underlying its passage was principally to override the economic reality test proposed by the Treasury Department and to require that the usual common-law rules realistically applied be used to determine whether a person is an "employee" for purpose of applying the Social Security Act. See e. g. Edwards v. United States, 168 F.Supp. 955, 957, 144 Ct.Cl. 158, 163 (1958); United States v. Crawford Packing Co., 330 F.2d 194, 195 (5th Cir. 1964); United States v. Thorson, 282 F.2d 157, 159 (1st Cir., 1960).[13] Thus, the Senate Finance Committee Report on the resolution[14] commented: that the usual common-law rules were well stated in the existing Treasury regulations (as contrasted with the proposed regulation) and that the existing regulations might be considered a valid extension of Congressional intent; that the "economic reality" concept was basic to the proposed regulation and that the proposed regulation would, therefore, discard the common-law rules for a new rule of "nebulous" and "dimensionless" character; that the proposed regulation would bring within the coverage of the Act many persons (including subcontractors) whose activities were largely or wholly free from direction as to how, and in frequent cases, as to when or whether they pursued them; and that when such services were performed without any direction or right of direction over the persons who performed them, and the persons who performed them were not in the least accountable for what they did, then properly under existing Treasury regulations such persons were recognized as independent contractors or self-employed in a class with independent contractors.
 
 
 44
 The legislative history further indicates that the Congress did not intend to upset the actual holdings in Silk, Greyvan and Bartels. The Senate Finance Committee report, for example, said that the decisions affirmed that the usual common-law rules "realistically applied" must be used to determine whether a person is an "employee" and that the Court applied the common-law control test realistically in deciding that the truck and moving van drivers were independent contractors and the loaders employees.[15]
 
 In the words of the report (p. 1769):
 
 45
 The doctrine of the Supreme Court in Silk, Greyvan, and Bartels, as reflected by its disposition of the specific situations presented in those cases, is an applied expression of the following statement of congressional intent in the legislative history:
 
 
 46
 The tests for determining the (employer-employee) relationship laid down in cases relating to tort liability, and other common-law concepts of master and servant, should not be narrowly applied (H.Rept. No. 728, 76th Cong., 1st Sess., p. 61).
 
 
 47
 * * * * * *
 
 
 48
 A sound reading of these cases requires that the prefatory and random remarks of the Court which have been seized upon to supply a spurious gloss of validity to the proposed Treasury regulation shall be harmoniously related to the facts involved, the decisions, and to their moving rules; and if this cannot be done they must be regarded as surplusage.
 
 
 49
 If we were compelled to interpret these remarks of the Court we would say, in untechnical and summary fashion and without aiming at complete exposition, that the lower courts and administrative agencies were told: Don't be fooled or unduly influenced by the form of the arrangement to which you must apply the Social Security Act. Look to the real substance. Illuminate the usual common-law control tests by regard for all the pertinent facts. This requires that all of the realities that will lead you to the truth must be consulted and weighed along with all other significant indicators of the real substance of the arrangement.[16]
 
 
 50
 But this again should be said: If we have misinterpreted these decisions of the Supreme Court, if we have incorrectly called the real moving principles of these cases, if the Treasury's interpretations and the proposed regulation based upon them are correct, then by this resolution we propose to restore the usual common-law rules, realistically applied.[17]
 
 
 51
 Several years later Congress enacted the Social Security Act amendments of 1950 (64 Stat. 477) expanding coverage to include not only "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee" but also specific classes of workers irrespective of the common-law test.[18] With respect to the classes of workers not specifically listed as employees, the definition remained unchanged and the conference report reiterated that the usual common-law rules realistically interpreted were to continue to apply. H.Rept. 2771 (81st Cong., 2d Sess.) p. 104.[19]
 
 
 52
 The conclusion to be drawn from the foregoing is that the existence or absence of an employment relationship is to be ascertained not by use of the economic reality test but by applying the common-law rules realistically. That is to say, the end-point determination — whether the person for whom the services are performed as an "employer" within the common-law meaning of that term — must be made on the basis of actual reality by looking to the substance of the arrangement and giving weight to all relevant factors. Pertinent in making the determination are such factors as: degrees or extent of control which the principal may exercise over the details of the work;[20] whether or not the principal has the right to discharge the individual; opportunity of the individual for profit and loss; investment by the individual in the tools and facilities for work; whether the individual or the principal supplies the tools and places to work; the degree of skill required in the particular occupation; the permanency and length of time the individual is engaged; the method of payment (whether by time or job); whether the work is part of the employer's regular business; and whether the parties believe they are creating an employer-employee relationship or a principal-independent contractor relationship. United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); Enochs v. Williams Packing & Nav. Co., 370 U.S. 1, 3, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962); Cape Shore Fish Co. v. United States, 330 F.2d 961, 965, 165 Ct.Cl. 630, 635, 636; Crossett Lumber Co. v. United States, 79 F.Supp. 20, 25 (D.Ark., 1948). See also Treasury Regulations under FICA (1954 Code) §§ 31.3121(d)-1(c); The Restatement of the Law, Agency 2d § 220. "[N]o one factor is controlling nor are these factors exclusive. The relationship is to be ascertained by an over-all view of the entire situation, not by any rule of thumb, or by the presence or absence of a single factor. The result in each case must be governed by the special facts and circumstances of the case itself." Cape Shore Fish Co. v. United States, supra, 330 F.2d p. 965, 165 Ct.Cl. pp. 636-637, and cases there cited.
 
 
 53
 Against this background the record here shows the following: The installers determined for themselves when they would work and their hours of work. They prepared their own work schedule. They provided their own trucks for transportation of themselves and the materials to the job site; furnished their own tools and equipment for performance of the work; paid all expenses for upkeep and maintenance of their trucks and equipment; and stored doors and windows for assigned jobs at their own expense.
 
 
 54
 The installers were free to work alone or with partners or associates of their own choosing and the compensation paid them was decided among themselves without interference by plaintiffs. They were also free to hire helpers of their own choice and to determine their pay, hours and working conditions.
 
 
 55
 The installers performed their work on a job-to-job basis and could reject jobs they deemed unsuitable without recrimination. "[P]ermanency of relationship can hardly be said to exist or be a weighty element where each obligation was of comparatively short duration and the worker was free to accept or reject the offer of a new or similar obligation." Silver v. United States, 131 F.Supp. 209, 212 (N.D.N.Y., 1954).
 
 
 56
 The installers were not members of a labor union and they dealt with plaintiffs on an individul basis. Normally they received payment for the job as a whole rather than on a time basis; for porch enclosure work such payment was on the basis of plaintiffs' acceptance of an installer's bid. The installers themselves could and did, in effect, compete with plaintiffs in some instances; further they often performed services for competitors of plaintiffs on the same day they installed plaintiffs' products, and it was a common occurrence for installers to have on their trucks at the same time products both of plaintiffs and plaintiffs' competitors.
 
 
 57
 In no instance was the work of an installer terminated during progress of the work. If not satisfied with the installer's work, plaintiffs simply would not offer them further work sheets while the installer, if dissatisfied, refused the next job offered by plaintiffs. "This [of course] is not the equivalent of a right to fire an [installer] from a job once he had begun to work on it. It is only evidence of the right not to enter into another contract." United States v. Thorson, 282 F.2d 157, 164 (1st Cir., 1960). See also Party Cab Co. v. United States, 172 F.2d 87, 93, 10 A.L.R.2d 358 (7th Cir., 1949). Any right of plaintiffs to terminate an installer's work in progress was subject to an obligation on plaintiffs' part to pay the installer in full for the entire amount of the job. A right of termination on this basis is available to any general contractor who engages a subcontractor. See American Homes of N. E. v. United States, 173 F.Supp. 857, 859 (D.Mass. 1959); Silver v. United States, 131 F. Supp. 209, 212 (N.D.N.Y.1954); Jagolinzer v. United States, 150 F.Supp. 489, 492 (D.R.I., 1957).
 
 
 58
 All work was done away from plaintiffs' premises and plaintiffs never attempted to control or direct the manner in which the installers did the work. Plaintiffs had no foremen or supervisors to direct the installers in the manner of doing the work and other than instructions contained in the worksheets — which the installers were expected to follow so that the work would be accomplished in accordance with the specifications contained therein — plaintiffs gave no directions or instructions to the installers concerning the manner or method of accomplishing the work. The installers called the plaintiffs for suggestions when unusual problems arose but this would not seem of particular significance. For even if a principal does intervene to some degree "so does the general building contractor intervene in the work of his subcontractors. * * Some such supervision is inherent in any joint undertaking, and does not make the contributing contractors employees." Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717-718 (2d Cir., 1943). "[A]n employer has a right to exercise such control over an independent contractor as is necessary to secure the performance of the contract according to its terms, in order to accomplish the results contemplated by the parties in making the contract, without thereby creating such contractor an employee." N. L. R. B. v. Steinberg, 182 F.2d 850, 856-857 (5th Cir., 1950). Further, it is important to distinguish "between authoritative direction and control, and mere suggestions as to details" of the work, Standard Oil Co. v. Anderson, 212 U.S. 215, 222, 29 S.Ct. 252, 254, 53 L.Ed. 480 (1909); H. E. Wolfe Const. Co. v. Fersner, 58 F.2d 27, 28 (4th Cir., 1932); indeed the fact that installers had the right to accept or reject plaintiffs' suggestions, as they saw fit, is an indication of the parties' understanding that the installers were free to perform the details of the work independently of and in opposition to the wishes of the principal. United States v. Wholesale Oil Co., 154 F.2d 745, 748 (10th Cir., 1946); Beckwith v. United States, 67 F.Supp. 902, 904 (D. Mass., 1946); Millard's Inc. v. United States, 146 F.Supp. 385, 388 (D.N.J., 1956).
 
 
 59
 Nor is it significant that plaintiffs' customers might be able to sue plaintiffs for the negligent acts of the installers. Assuming this to be so, such "liability would be predicated upon the doctrine of estoppel, or a holding out to the public. * * * [and] these considerations are in no way determinative of the actual relationship between * * [plaintiffs and the installers]; for the nature of that relationship stems from the contract [or arrangement] between the parties." Magruder v. Yellow Cab of D. C., 141 F.2d 324, 325, 152 A.L.R. 516 (4th Cir., 1944).
 
 
 60
 A further factor here is that the parties believed that they were creating a principal-independent contractor relationship and not an employer-employee relationship. The installers considered that they had their own business and that they were self-employed; they paid self-employment taxes; some had their own business cards; they carried personal and property liability insurance and were required to deposit with plaintiffs a certificate showing they had such coverage before being given any installation work. Plaintiffs did not carry any workmen's compensation policy covering installers; did not pay State unemployment insurance on the earnings of installers; and did not withhold income taxes or assume liability for unemployment taxes on installers' earnings. Cf. Cape Shore Fish Co. v. United States, supra, 330 F. 2d p. 968, 165 Ct.Cl. pp. 641-642. While installers were eligible to enroll in plaintiffs' Blue Cross-Blue Shield plan for their employees, this would not seem decisive as to how the parties viewed their relationship. For the test of eligibility for enrollment was based not on whether the enrollee was an employee in the common-law sense but on whether he had a "rapport" with plaintiffs and there was a common mechanism for collecting and forwarding premiums to Blue Cross. So long as these criteria were met, independent contractors — such as plaintiffs' salesmen — were eligible. See Thor Co. v. United States, 173 F.Supp. 65, 68-69 (D.Mass., 1959), aff'd United States v. Thorson, 282 F.2d 157, 163 (1st Cir., 1960).
 
 
 61
 The factors here in their totality establish that plaintiffs did not have the right under the arrangement to control the manner and method in which the installers performed the work. They also establish that "plaintiffs' only concern was that the * * * [installers] accomplish a result in conformity with the terms of the contract with the owner of the structure to which the * * * [material] was being applied." Edwards v. United States, 168 F.Supp. 955, 957-958, 144 Ct.Cl. 158, 163 (1958). Plaintiffs had no "more power of control over the * * * [installers] than a house owner would exercise over the independent contractor who undertook the painting of his house." Silver v. United States, 131 F.Supp. 209, 212 (N.D.N.Y., 1954); Id., Edwards v. United States, supra; Jagolinzer v. United States, 150 F.Supp. 489, 492 (D.R.I., 1957). It is concluded, therefore, that the installers were, during the period involved, independent contractors and not employees within the meaning of the social security and unemployment tax statutes.
 
 
 62
 This conclusion is in harmony with that reached by this court and a number of other courts in cases involving applicators in the home-improvement industry who (except that they applied roofing and siding to homes of a contractor's customers rather than doors and windows) worked under arrangements generally similar to those described here. Thus, in the following reported decisions applicators were found to be independent contractors rather than employees for social security and unemployment tax purposes: Edwards v. United States, 168 F.Supp. 955, 144 Ct.Cl. 158 (1958);[21] United States v. Thorson, 282 F.2d 157 (1st Cir., 1960), affirming Thor Co. v. United States, 173 F.Supp. 65 (D.Mass.1959); Levin v. Manning, 124 F.Supp. 192 (D. N.J., 1952); Metropolitan Roofing & Modernizing Co. v. United States, 125 F.Supp. 670 (D.Mass.1954); Silver v. United States, 131 F.Supp. 209 (N.D. N.Y., 1954); Farm & Home Modernization Corp. v. United States, 138 F.Supp. 423 (N.D.N.Y.1956); Millard's Inc. v. United States, 146 F.Supp. 385 (D.N.J., 1956); Jagolinzer v. United States, 150 F.Supp. 489 (D.R.I., 1957); Zipley v. United States, 156 F.Supp. 141 (E.D.Pa., 1957); Consolidated Housecraft v. United States, 170 F.Supp. 842 (E.D.N.Y., 1959); American Homes of N. E. v. United States, 173 F.Supp. 857 (D.Mass., 1959); Fleeman v. United States, 175 F.Supp. 336 (N.D.Ohio, 1959); Mervis v. United States, 187 F.Supp. 248 (E.D. La., 1960); Loeb v. United States, 209 F.Supp. 22 (E.D.La., 1962).
 
 
 63
 Three reported decisions reached a contrary result finding that applicators were employees: E. F. Williams Co. v. United States, 139 F.Supp. 875 (N.D.N.Y., 1956); Security Roofing & Const. Co. v. United States, 163 F.Supp. 794 (D.Mass., 1958); Ben v. United States, 139 F.Supp. 883 (N.D.N.Y., 1956), aff'd per curiam 241 F.2d 127 (2d Cir., 1957). But each of these cases is clearly distinguishable on its facts from the case here. Thus in Williams the scaffolding and equipment for performance of the work belonged to the taxpayer; each of the roofers had worked steadily for the taxpayer for a period of from 24 to 27 years; the taxpayer furnished all the helpers and fixed their pay at hourly rates; the applicator had no control over the helper; on at least 50% of the jobs extra work was required for which the applicators were paid at hourly rates agreed upon at the opening of the season; the larger jobs were applications of hot tar on flat roofs compensated at hourly rates; an indiscriminate right of discharge was reserved in the management. In Security Roofing the applicators were required to avoid doing any additional work of any kind for a customer and could not resolve any problem without notifying the taxpayer; the taxpayer engaged a number of inexperienced men and checked on them from time to time; if the applicator needed any instructions in how to conserve material or how to apply new material, he received it; the taxpayer could take an applicator off one job and move him to another; on occasion the taxpayer split a team working on one job and sent one of the men to take care of some of the others.[22] In Ben an applicator who declined a work sheet would not be offered further work; it was expected that the applicator would take each job offered; the applicator was restricted from the performance of any outside work that would place him in a position of competition to the taxpayer's business; there was evidence of long-continued employment by the applicators over a period of years and approximately no evidence of any affirmative act on the part of the applicators in offering their services to the public; a broad right of discharge was asserted by the taxpayer, and the taxpayer on one occasion dismissed an applicator from a particular job because his action offended the home-owner.[23]
 
 
 64
 In view of the conclusion reached here that the installers were independent contractors and not employees, the deficiency assessments made by the Commissioner of Internal Revenue were beyond his statutory power. Plaintiffs are, therefore, entitled to recover and defendant's counterclaims must be dismissed.
 
 
 
 Notes:
 
 
 [1]
 Section 3402(a) of the Code requires every employer to withhold income taxes from the wages which he pays to his employees. Section 3401(c) includes specified persons within the term "employee" but does not define the term itself. However, the court decisions and the Treasury Regulations on Employment Tax (1954 Code), § 31-3401(c)-1(b), treat the "usual common-law rules" tests as applicable to the definition of an "employee" under the income tax withholding provisions. See, e.g., Titanium Ores Corp. v. United States, 205 F.Supp. 606 (D.Md., 1962)
 
 
 [2]
 Installers in some instances applied siding and built porch enclosures on customers' homes
 
 
 [3]
 Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2d Cir., 1943). See also Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan, 179 F.2d 882, 884 (8th Cir., 1950); Anglim v. Empire Star Mines Co., 129 F.2d 914, 917 (9th Cir., 1942)
 
 
 [4]
 The Treasury Regulations (1954 Code) promulgated under FUTA and the income withholding statute contain the same tests for determining who are employees. See 26 CFR §§ 31.3306(i)-1; 31.3401(c)-1
 
 
 [5]
 49 Stat. 620, 647. The identical language contained in § 1106(a) (6) was carried over to §§ 1426 and 1607 of the Internal Revenue Code of 1939
 
 
 [6]
 1 F.R. 1764 (1936). This regulation is reproduced in United States v. Silk, 331 U.S. 704, 714, fn. 8, 67 S.Ct. 1463, 91 L. Ed. 1757 (1947)
 
 
 [7]
 See, e.g. Texas Co. v. Higgins, 118 F.2d 636 (2d Cir., 1941); Radio City Music Hall Corp. v. United States, 135 F.2d 715 (2d Cir., 1943); Jones v. Goodson, 121 F.2d 176 (10th Cir., 1941); Glenn v. Beard, 141 F.2d 376 (6th Cir., 1944), cert. den. 323 U.S. 724, 65 S.Ct. 57, 89 L. Ed. 582; United States v. Mutual Trucking Co., 141 F.2d 655 (6th Cir., 1944); McGowan v. Lazeroff, 148 F.2d 512 (2d Cir., 1945); United States v. Wholesale Oil Co., 154 F.2d 745 (10th Cir., 1946)
 
 
 [8]
 See e.g. United States v. Vogue, 145 F.2d 609 (4th Cir., 1944) where the court followed the principle enunciated in N.L.R.B. v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), that the term "employee" under the National Labor Relations Act was to be construed not by reference to "technical common-law concepts", but rather by reference to the purpose of the Act and the facts involved in the economic relation
 
 
 [9]
 United States v. Aberdeen Aerie, 148 F. 2d 655 (9th Cir., 1945); Grace v. Magruder, 80 U.S.App.D.C. 53, 148 F.2d 679 (1945), cert. den. 326 U.S. 720, 66 S.Ct. 24, 90 L.Ed. 426
 
 
 [10]
 In this case the Court upheld the taxpayer's contention that members of name-bands which played short-term engagements at public dance halls were for purpose of social security legislation employees of the bandleader and not of the operator of the dance hall. In reaching this result the Court pointed out that the leader organized and trained the band and selected the members; that it was his musical skill and showmanship that determined the success or failure of the organization; that the relationship between him and the other members was permanent; and that he bore the loss or gain after payment of the members' wages and other expenses. Not deemed decisive was the fact that under a standard-form contract between the musicians' union and the dance-hall operators, the latter were specified to be the employers of the musicians and their leader and "shall at all times have complete control of (their) services * * *." Such a contractual shift, it was held, did not authorize the Commissioner to collect taxes from those not covered by the taxing statute
 
 
 [11]
 12 F.R. 7966 (1947). Part (b) of the proposed regulation stated in part:
 "Whether the services performed by an individual constitute him an employee as a matter of economic reality * * * is determined in the light of a number of factors * * *." The factors set forth included degree of control, permanency of relation, integration of the individual's work in the business to which he renders service, skill required by the individual, investment by the individual in facilities for work, and opportunities of the individual for profit or loss. The proposed regulation also provided that "although control is characteristically associated with the employer-employee relationship, determination of whether, as a matter of economic reality, an individual is an employee of the person for whom he is performing services, or is an independent contractor is not to be made solely on the basis of control which such person may or can exercise over the details of such service."
 
 
 [12]
 The President's veto message stated in part that "Despite representations to the contrary, sections 1 and 2 of this resolution would exclude from * * * coverage * * * up to 750,000 employees, consisting of a substantial portion of the persons working as commission salesmen, life-insurance salesmen, piece workers, truck drivers, taxicab drivers, miners, journeymen tailors, and others. In June 1947, the Supreme Court held that these employees have been justly and legally entitled to social-security protection since the beginning of the program in 1935." 2 U.S.Code Cong.Service (1948) p. 2501
 
 
 [13]
 The legislative history of the resolution was considered in United States v. Thorson, supra; Ringling Bros. Barnum & Bailey Combined Shows v. Higgins, 189 F.2d 865, 867-869 (2d Cir., 1951); Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan, 179 F.2d 882, 888 (8th Cir., 1950); Party Cab Co. v. United States, 172 F.2d 87, 89-91, 10 A.L.R.2d 358 (7th Cir., 1949); Crossett Lumber Co. v. United States, 79 F.Supp. 20, 23-25 (W.D. Ark., 1948). See also Broden, Employment Relationships Under Social Security, 33 Temple L.Q. 381, 383 et seq. (1960)
 
 
 [14]
 S.Rep. 1255, 80th Cong., 2d Sess.; 2 U.S. Code Cong.Service (1948) p. 1752 et seq. All page references hereafter are from the latter publication
 
 
 [15]
 The report (p. 1757) observed that the lower Federal courts adopted the precedents of local law in determining the existence of an employer-employee relationship, and that since these varied among the States, conflicts in the court decisions followed even though the factual determinations were not unlike. The report added (p. 1758) that properly interpreted the Supreme Court decisions "should resolve the conflict of lower court decisions and encourage nation-wide uniformity of application of the act." This would seem to indicate a Congressional purpose to establish "a standard, to be realistically applied, for the guidance of federal courts in reaching a conclusion on the problem, irrespective of the `common-law' rules of the various States." Crossett Lumber Co. v. United States, 79 F. Supp. 20, 25 (W.D.Ark., 1948)
 
 
 [16]
 The report commented (pp. 1762-1763) that all of the following factors and any others which are "pertinent to the end-point determination of whether there is common-law control, may and should be used"; integration of the individual's work in the business to which he renders service; investment in facilities; opportunities for profit and loss; permanency of relation; and skill required
 
 
 [17]
 When the resolution was before the House on the motion to pass it over the President's veto, Representative Gearhart, who was in charge, made the following statement concerning the Supreme Court decisions, the proposed Treasury regulation, and Congressional purpose underlying the resolution (94 Cong.Rec. 8189, June 14, 1948):
 However, there crept into these decisions a little of what lawyers call obiter dicta; that is, some words which were quite unnecessary to the result. These words were to the effect that, for purposes of social security, the Social Security Administration was not necessarily bound in extending the social-security coverage, by the ancient common-law definition of master and servant, or employer and employee, as you may choose to call it, but that they could take into the system as employees any persons who were dependent upon a business in the light of economic realities, thereby throwing into the entire system a confusion which required immediate legislative attention.
 The Social Security Administration and the Treasury proceeded immediately to prepare a departmental regulation to carry that obiter dicta definition into effect. If this Congress had not interfered, tens of thousands of people in America who never dreamed they were employed by anybody and never for one moment thought they were covered by social security or subject to payroll taxes would have found that they had been swept into the social-security system by bureaucratic ukase. In other words, they would suddenly have found that they had more employers than a dog had fleas. So, to end this confusion, this Congress acted promptly, and, after thoroughgoing debate, and by a vote of nearly 7 to 1, proceeded by legislation to put the matter in order once again by restoring the ancient doctrine of the common law defining the relation of master and servant, employer and employee.
 See also United States v. Thorson, 282 F. 2d 157, 161 (1st Cir., 1960); Party Cab Co. v. United States, 172 F.2d 87, 90-91, 10 A.L.R.2d 358 (7th Cir., 1949).
 
 
 [18]
 Included under the coverage of the Act as employees were persons engaged in a variety of occupations (none of which are relevant here), such as agents or commission drivers distributing specified products, full-time life insurance salesmen, certain home workers and traveling salesmen. Installers were not mentioned
 
 
 [19]
 The Social Security Act Amendments of 1950 also brought self-employed persons within the program
 
 
 [20]
 "The test lies in the degree to which the principal may intervene to control the details of the agent's performance: * * *" The fact that a principal "did intervene to some degree" is not conclusive of the employment relationship; "so does a general building contractor intervene in the work of his subcontractors. He decides how the different parts of the work must be timed, and how they shall be fitted together; if he finds it desirable to cut out this or that from the specifications, he does so. Some such supervision is inherent in any joint undertaking, and does not make the contributing contractors employees." Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717-718 (2d Cir., 1943). In considering the degree of control it is not necessary that the direction and control relate to every detail in order to establish an employee relationship; it is enough that the principal retain such reasonable measure of direction and control over the method and means of performing the work that the individual is not free to perform the work independently of or in opposition to the wishes of the principal. Jones v. Goodson, 121 F.2d 176, 180 (10th Cir., 1941); United States v. Wholesale Oil Co., 154 F.2d 745, 748 (10th Cir., 1946); Beckwith v. United States, 67 F.Supp. 902, 904 (D.Mass.1946). See also Party Cab Co. v. United States, 172 F.2d 87, 92 (7th Cir., 1949)
 
 
 [21]
 The factors in the present case tending to show an independent contractor relationship would seem to be stronger than those in Edwards. For example here the installers sometimes submitted bids to plaintiffs for porch enclosures to customers' homes, a circumstance not present in Edwards. Also in Edwards, unlike the present case, plaintiff made delivery of materials to the job site; withheld social security taxes from the earnings of the applicators; paid State unemployment taxes on the earnings of the applicators; and made contributions to the State industrial program on behalf of the applicators
 
 
 [22]
 Judge Aldrich who wrote the opinion in Security Roofing was later elevated to the Court of Appeals and concurred in that court's opinion in United States v. Thorson, 282 F.2d 157 (1st Cir., 1960), affirming the District Court's finding that applicators were independent contractors. The Court of Appeals in Thorson distinguished Security Roofing on the basis, among others, that the taxpayer in the latter case could take an applicator off one job and move him to another, and that on occasion the taxpayer split teams. (282 F.2d 164-165)
 
 
 [23]
 Judge Brennan who wrote the opinions in Ben and Williams had also written the opinions in Silver and Farm & Home Modernization Co. in which he concluded — on the basis of the particular facts — that the applicators were independent contractors. He indicated in Ben that the case differed factually from Silver "in several important aspects." (139 F. Supp. 886.) The taxpayer in Ben subsequently brought suit in this court for refund of FICA and FUTA taxes paid in later years. This court dismissed the action on the principle ofstare decisis since the taxpayer's business practices during the period in question were for all significant purposes identical with the years involved in the prior action. Ben Construction Corp. v. United States, 160 Ct.Cl. 604, 312 F.2d 781 (1963).